Federal Defenders
OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David Patton
*Executive Director and Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

September 18, 2023

**Via ECF and Email**
The Honorable William F. Kuntz, II
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**Re: United States v. Frank James, 22-CR-214 (WFK)**

Your Honor:

Tormented by lifelong paranoid schizophrenia, on April 12, 2022, Frank James snapped. That spring morning marked nearly fifty years since his first Thorazine and Haldol sedations to stop the hallucinations he first suffered as a teenager. After decades of persistently seeking, but never receiving, appropriate mental health care, Mr. James wrought unspeakable horror on innocent subway riders, each entirely blameless for his struggles. His actions were inexcusable, and he does not justify or minimize them. Given his age, his health, and the Bureau of Prisons' notoriously inadequate medical care, sixty-four-year-old Frank James will not survive any prison sentence that reflects the harm he caused. But Mr. James is not evil. He is very, very ill. A just sentence in this case tempers the natural urge for retribution with mercy. We respectfully seek a properly-calculated Guidelines sentence of 18 years—a significant term that vastly outpaces his life expectancy.

## I. Objections to the Presentence Investigation Report

The Sunset Park subway shooting was the tragic manifestation of Frank James's inner devaluation of human life. Decades of degradation and discrimination, both real and perceived, drove him to abject apathy. He no longer appreciated life or death, his own or others. By then, Mr. James saw himself as hopeless. He cared only that his relentless cries for help finally be heard, so that other severely mentally ill people would be able to access help before reaching that point.

Mr. James's crime was a horrible act of extraordinary recklessness, evincing an extreme indifference to human life. When he began his attack on the N train, his intention—cabined by his severe mental illness—was to wreak havoc, come what may. The subway train was stalled between stations. The passengers were trapped; they could not move between cars or disembark. It was crowded: morning rush-hour in Sunset Park for a diverse array of defenseless people. Had

it been his intention, Mr. James had no impediment to committing point-blank executions of the "children on their way to school, families, pregnant women, college students, and individuals on their way to work." Presentence Investigation Report ("PSR") at ¶ 21. That's not what happened.

Mr. James set off smoke bombs, making it difficult to see. He fired thirty-two shots from a Glock 17; half of them hit the floor, seats, or the walls of the train car. PSR ¶ 20. The other half hit ten victims, all below the waist. *Id*. He understood, of course, the natural consequence of firing a semi-automatic pistol in a crowded subway car. He knew that if his bullets hit people, they would become injured or worse. He did not care if they lived or died.

According to the PSR, Mr. James's crime—a tragic horror, to be sure, though not a homicide—is the worst crime imaginable in the United States Code: literally off the charts. *See* PSR ¶¶ 131, 134 (calculating a combined adjusted offense level of 44, reduced to the maximum level of 43). The PSR reaches that erroneous conclusion through three errors: (1) the misuse, ten times, of the attempted first-degree murder Guideline, PSR ¶¶ 67, 73, 79, 85, 91, 97, 103, 109, 115, 121; (2) the wrongful application of an obstruction of justice enhancement, based on Mr. James's true plea allocution, PSR ¶¶ 63, 71, 77, 83, 89, 95, 101, 107, 113, 119, 125; and (3) an unjustified withholding of acceptance of responsibility points, treating Mr. James's guilty plea—to an eleven-count indictment, without any benefit of a plea agreement—as equivalent to having proceeded to trial. PSR ¶¶ 64, 133.

**A. The Proper Base Offense Level for Counts One through Ten is U.S.S.G. § 2A2.2, Aggravated Assault**

Mr. James pled guilty to each of ten counts of 18 U.S.C. §1997(a)(7), which criminalizes the commission of "an act, including the use of a dangerous weapon, with the intent to cause death *or* serious bodily injury to any person" within the mass transit system (emphasis added). The Guidelines Manual provides three potentially applicable base offense levels: U.S.S.G. §§ 2A2.1(a)(1) (Assault with Intent to Commit First Degree Murder); 2A2.1(a)(2) (Assault with Intent to Commit Any Other Murder); and 2A2.2 (Aggravated Assault). The application of 2A2.1(a), whether subsection (1) or (2), requires an intent to commit murder. A person intends to commit first degree murder when his conduct would meet the elements of 18 U.S.C. § 1111, requiring the unlawful killing of a human being with malice aforethought, to encompass "willful, deliberate, malicious, and premeditated killing." "Any other murder is murder in the second degree." *Id.* Intended killings lacking that mens rea are not attempted murders. Attempted manslaughter, for example, is covered by 2A2.2. *See* Commentary, Background to U.S.S.G. § 2A2.1. So too are assaults borne of the intention to cause bodily injuries, including those that result in permanent or life-threatening ones. App. Note 1, U.S.S.G. § 2A2.2. Courts determine the relevant "reason and judgment of the defendant" "at the time of the [attempted] killing." *United States v. Velazquez*, 246 F.3d 204, 210 (2d Cir. 2001).

Attempted murder is a specific intent offense. "Although a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill." *Braxton v. United States*, 500 U.S. 344, 350-351 n.** (1991) (internal quotation marks omitted). Shooting recklessly—even with extreme indifference to human life—is insufficient. *See United States v.*

*Kwong*, 14 F.3d 189, 194-95 (2d Cir. 1994) (finding jury instruction erroneous where it authorized jury to convict defendant of attempted murder based on mens rea of a "reckless and wanton course of conduct on the part of the defendant which grossly deviated from a reasonable standard of care which would make him aware of the serious risk of death"). "The fact that a deadly weapon was used does not *ipso facto* prove the specific intent." *Kwong*, 14 F.3d at 194.

Thus, for either attempted-murder Guideline to apply, the government must show that when Mr. James fired the weapon, he did so with the specific intent of killing the victim. Extreme indifference to human life falls short. Further, because Mr. James was charged separately with, and pled guilty to, a charged offense for each named victim, application of the attempted-murder Guideline to each count requires a specific intent to kill the named victim. For example, Count 9 applies the attempted first-degree murder Guideline to the shooting of J.T., whose injury was a 1.5-centimeter graze abrasion. PSR ¶¶ 55, 115.

Many courts within this Circuit have refused to apply the attempted-murder Guideline to gun violence cases where the circumstances evince recklessness, rather than a willful intent to kill. Where a defendant's "conduct created a 'grave risk of death' and he acted with a mens rea of 'depraved indifference to human life,'" his actions are reckless, lacking the specific intent to kill. *United States v. Legros*, 529 F.3d 470, 474–75 (2d Cir. 2008). In *United States v. Williams*, Judge Matsumoto declined to apply the attempted-murder Guideline where video showed the defendant shooting at individuals in a car approximately 10 to 15 feet away, holding that "it would be really a stretch to determine what [the defendant's] intent was in that video." *See* Tr. of Sent., ECF No. 48-1 at 35, 19-CR-5 (KAM) (E.D.N.Y. Aug. 13, 2019). In *United States v. Escort*, Judge Cote did not apply the attempted murder Guideline where the defendant "pointed a firearm in the direction of a person after they had an animated dispute or quarrel," "then discharged the weapon in the direction of where other pedestrians and cars were." *See* Tr. of Sent., ECF No. 58 at 5, 21-CR-387 (DLC) (S.D.N.Y. Jan. 28, 2022). In *Escort*, Judge Cote reached this conclusion because "at some distance away…one could argue it was just so reckless, and in the heat of the moment, done with so much anger, that you might not have had the specific intent to kill, though you certainly had depraved indifference to human life and were engaged in an activity that created a grave risk of death." *Id*. at 8. *See also United States v. Jackson*, 351 F. Supp. 2d 108, 113–16 (S.D.N.Y. 2004) (declining to apply U.S.S.G. § 2A2.1 where defendant repeatedly fired machine gun in a shootout where at least one person was seriously injured, and holding that "[t]o find a person guilty of attempted murder…requires a detailed inquiry into the state of mind and circumstances of a[n attempted] killing"); *United States v. Williams*, Tr. of Sent., ECF No. 44 at 8, 20-CR-489 (JMF) (S.D.N.Y. Aug. 25, 2021) (declining to apply attempted-murder cross-reference where no evidence of defendant shooting directly at victims); *United States v. Tartt*, ECF No. 60, 20-CR-339 (LGS) (S.D.N.Y. Jan. 10, 2022) (declining to apply attempted-murder cross-reference where defendant shot at the victims and missed, twice, finding no specific intent to kill); *United States v. Knox*, Tr. of Sent., ECF No. 56, 21-CR-46 (GBD) (S.D.N.Y. Sept. 2, 2022) (declining to apply attempted-murder cross-reference where defendant shot in the direction of nine people across the street); *United States v. Oquendo*, Tr. of Sent., ECF No. 682 at 6, 17-CR-611 (AT) (S.D.N.Y. Sept. 1, 20202) (declining to apply attempted-murder Guideline).

"[I]ntent is often established by circumstantial evidence." *United States v. Anderson*, 747 F.3d 51, 66 (2d Cir. 2014). Here, it is true that Mr. James began expressing interest in, purchased supplies for, and indeed, prepared for committing a mass shooting years earlier than April 12, 2022. PSR ¶¶ 34–46. While his state of mind leading up to the attack is relevant, the ultimate and dispositive mens rea is the one he possessed when it commenced. *Velazquez*, 246 F.3d at 210 (2d Cir. 2001). In the heat of the moment, plans change. Mr. James trapped his vulnerable victims in a subway car, leaving them no egress. He calculated, correctly, that they were unarmed. Yet he did not shoot even one person in the head, or in the chest. Half his rounds struck no one at all. Of the 17 bullets that hit people, many hit victims in the knees, PSR ¶¶ 48, 50; the buttocks, PSR ¶¶ 49, 54; the bottom of the foot, PSR ¶ 51; the hand, PSR ¶ 56, or caused a slight graze wound. PSR ¶ 55. Fortunately, no victim died. Occam's razor helps. In a society where, sadly, we learn nearly every day that mass shooters who intend to kill readily achieve their goals, it is far more likely that Mr. James lacked that specific intent than that he simply failed in his mission, 32 times.

With extreme and even depraved indifference to human life, Mr. James unloaded a pistol in a crowded subway car, causing a range of injuries, some permanent and life-threatening. The aggravated assault Guideline, together with enhancements, applies to each of Counts One through Ten:

| | |
|---|---|
| Base Offense Level: | 14 (§ 2A2.2(a)) |
| Specific Offense Characteristics: | +2 (§ 2A2.2(b)(1), more than minimal planning) |
| | +5 (§ 2A2.2(b)(2)(A), firearm discharged) |
| | +5 (§ 2A2.2(b)(3), serious, permanent, or life-threatening bodily injury)[1,2] |
| Adjusted Offense Level: | 26 |
| Grouping of Counts 1-10: | +5 (§ 3D1.4) |
| Combined Adjusted Offense Level: | 31 |

Accordingly, without adjustments for obstruction of justice, Part I(B), *infra*, or acceptance of responsibility, Part I(C), *infra*, Mr. James's adjusted offense level is 31, not 43. PSR ¶ 134.

### B. Mr. James Should Not Receive Obstruction Points for Committing Perjury When His Allocution Was Both Subjectively True and Objectively Consistent with the Evidence

The PSR wrongly applies a two-point enhancement for obstruction of justice to each of Counts One through Ten, asserting that Mr. James's plea allocution as to his own state of mind at the time of the attack was perjurious. PSR ¶ 63. By contrast, when this Court asked its view, the

[1] "The cumulative adjustments from application of subdivisions (2) and (3) shall not exceed 10 levels." U.S.S.G. § 2A2.2(3).

[2] Mr. James's does not challenge the PSR's determinations of permanent or life-threatening injury in Counts One, Five, Seven, Eight, and Ten. Pursuant to § 3D1.4, applying a maximum of five points in the grouping analysis, the Court need not categorize the severity of harm in the remaining counts.

government concluded that, "the government believes the defendant's allocution satisfies the elements for his intent." ECF No. 75 at 46. The government was right the first time: Mr. James did not commit perjury in his allocution, because it was true.

"In determining what constitutes perjury, we rely upon the definition that has gained general acceptance and common understanding under the federal criminal perjury statute, 18 U.S.C. § 1621. A witness testifying under oath or affirmation violates this statute if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). "If a defendant objects to a sentence enhancement resulting from her [] testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out." *Id*. at 95. "To apply the enhancement on grounds of perjury, the district court must find that 'all of the factual predicates for a finding of perjury' have been shown." *United States v. Ben–Shimon*, 249 F.3d 98, 102 (2d Cir. 2001) (*quoting Dunnigan*, 507 U.S. at 95 (1993)). "A district court cannot satisfy *Dunnigan* simply by adopting a PSR's 'conclusory statements' that the defendant committed perjury." *Id*. at 103–04.

"To impose an obstruction-of-justice adjustment, the court must make a finding of specific intent" to willfully provide false testimony. *United States v. Thompson*, 808 F.3d 190, 194 (2d Cir. 2015). Before imposing the adjustment, the district court must find that the defendant "consciously act[ed] with the purpose of obstructing justice." *United States v. Lincecum*, 220 F.3d 77, 80 (2d Cir. 2000). "When making a finding as to a defendant's specific intent to obstruct justice, a district court may look to and rely on circumstantial evidence and all reasonable inferences that may be drawn from that evidence." *United States v. Brown*, 321 F.3d 347, 351 (2d Cir. 2003). A witness who testifies truthfully does not commit perjury, even if his belief was irrational or mistaken. *United States v. Catano-Alzate*, 62 F.3d 41, 43 (2d Cir. 1995). The obstruction enhancement should not be applied when a defendant "may have reasonably believed that his statement was true," whether because of a misunderstanding, a lapse in memory, or otherwise. *United States v. Lewis*, 62 F.4th 733, 747 (2d Cir. 2023) (*citing United States v. Pena*, 751 F.3d 101, 105–07 (2d Cir. 2014)).

Here, Mr. James's state of mind is relevant at two times: the time of the crime and the time of the plea allocution. The PSR avers that Mr. James "falsely claimed" in his plea allocution "that 'his intention was to cause serious bodily injury,' and not "'to cause death.'" PSR ¶ 63. For all the reasons explained in Part I(A), the objective physical evidence—the lack of any deaths, under these circumstances; the location of the injuries suffered; the number of shots fired wildly, hitting no one—supports an inference of extreme indifference to human life, not a specific intent to kill. When Mr. James provided his plea allocution, he spoke to his subjective understanding of what he meant to do when he fired his weapon, something he surely is in the best position to know. In that vein, he testified to the best of his ability, at the time of the plea, to elucidate his mindset at the time of the offense, explaining that "I was fully aware of the fact that a death or deaths could occur as a result of my discharging a firearm in such an enclosed space in the subway car," ECF No. 75 at 44, risks he clearly disregarded. His testimony was consistent with the disjunctive elements of the charged offense. 18 U.S.C. §1997(a)(7) (criminalizing the

commission of "an act, including the use of a dangerous weapon, with the intent to cause death *or* serious bodily injury to any person" within the mass transit system) (emphasis added). The PSR provides no evidence that when he so allocuted, he "consciously act[ed] with the purpose of obstructing justice." *Lincecum*, 220 F.3d at 80 (2d Cir. 2000). There isn't any, because his allocution was true.

Accordingly, Mr. James should not receive two-point enhancements for obstruction of justice in his Counts One through Ten Guidelines calculation. PSR ¶¶ 63, 71, 77, 83, 89, 95, 101, 107, 113, 119, 125. As a result, his adjusted offense level remains 31.

**C. Mr. James Has Clearly and Timely Accepted Responsibility for His Crimes**

Finally, the PSR erroneously withholds from Mr. James the three-point adjustment for acceptance of responsibility, despite his clearly and timely doing so. PSR ¶¶ 65, 133. The PSR explains that "a defendant who obstructs or impedes the administration of justice ordinarily has not accepted responsibility for his criminal conduct" and "an adjustment for acceptance of responsibility is not warranted." *Id.*; U.S.S.G. § 3E1.1. Because Mr. James did not obstruct justice, Part I(B), *supra*, he is entitled to acceptance-of-responsibility credit. Even if the Court finds obstruction, which it should not, this is a clear case where Mr. James has accepted responsibility, nonetheless. "Extensive precedent supports granting acceptance of responsibility credit despite obstruction of justice, in appropriate cases." *United States v. Johnson*, 212 F. Supp. 2d 202, 212 (S.D.N.Y. 2002) (*citing United States v. Restrepo*, 936 F.2d 661, 669 (2d Cir. 1991); *United States v. Enriquez*, 42 F.3d 769, 773 (2d Cir. 1994); *United States v. Enriquez*, 42 F.3d 769, 773 (2d Cir. 1994); *United States v. Ruggiero*, 100 F.3d 284, 295 (2d Cir. 1996); *United States v. Kelly*, 169 F. Supp. 2d 171, 173-174 (S.D.N.Y. 2001); *United States v. Maurer*, 76 F. Supp. 2d 353, 360 (S.D.N.Y.1999)); *see* App. Note 4, U.S.S.G. § 3E1.1 ("There may, however, be extraordinary cases in which adjustments under both §3C1.1 and §3E1.1 may apply").

"The paramount factor in determining eligibility for § 3E1.1 credit is whether the defendant truthfully admits the conduct comprising the offense or offenses of conviction." *United States v. Kumar*, 617 F.3d 612, 637 (2d Cir. 2010). Mr. James "has at all times acknowledged his guilt of the underlying offense." *Johnson*, 212 F. Supp. 2d at 212 (S.D.N.Y. 2002). He plainly admitted the conduct comprising the offenses of conviction, truthfully: he "traveled from Philadelphia, Pennsylvania to New York City, New York;" he "got upon a subway train that was carrying passengers;" he "started shooting a firearm;" and he "injured" "individuals" "on the train from when I discharged the firearm." ECF No. 75 at 44. This is clearly the "conduct comprising the offenses of conviction"—it meets every element of the statute, and admits, in total, the actions he took and the harm he caused.

Mr. James's acceptance of responsibility must be considered within the context of his specific case and the value of his guilty plea relative to forcing the case to trial. In *Restrepo*, the Circuit held that the district court properly applied acceptance of responsibility points, despite receiving an obstruction enhancement, where "he pled guilty to all charges in a four-count indictment and admitted in some detail his activities in connection with the criminal enterprise." 936 F.2d at 669 (2d Cir. 1991). Even more so than Restrepo, Mr. James's early plea to ten major

terrorism charges, along with a consecutive ten-year 924(c) count, without a plea agreement, and with life exposure, is extraordinary. Without acceptance points—in a case where he unequivocally admitted his conduct, and met every element of the statute, as the government agreed—his guilty plea is equivalent for Guidelines purposes as having had, and lost, a trial. Mr. James's guilty plea spared at least ten victims from testifying as to the harm they suffered, as well as a massive expenditure of the government's resources in proving its case with forensic, technological, physical, and circumstantial evidence. He began accepting responsibility when he returned from Newark, New Jersey to Manhattan, PSR ¶ 26, to peacefully turn himself in to law enforcement. PSR ¶ 27. The act of his guilty plea, underlined by his clear statement, absolved the government of meeting its burden of proof at trial. Acceptance points are appropriate.

Accordingly, Mr. James's combined adjusted offense level of 31 is decreased by three levels to 28. U.S.S.G. §§ 3E1.1(a), (b). With a criminal history score of zero, at Criminal History Category I, PSR ¶ 150, the correct Guidelines range for Counts One through Ten is 78-97 months. With the additional 120 months for Count Eleven, which must be imposed consecutively to Counts One through Ten, the final, total guidelines range is 198-217 months, or 16.5 to 18 years.

## II. The Instant Offense Was the Culmination of a Lifetime of Struggle

By the time Frank James boarded the Manhattan-bound N train on April 12, 2022, his entire life had been defined by trauma and hardship, inexplicably bound up in his untreated severe mental illness. *See* Ex. A (Report of Client and Mitigation Specialist Danielle Azzarelli). Mr. James was born into a family where genetics predisposed nearly everyone to psychological challenges, in a time and place that were neither equipped nor structurally designed to meet their needs. Without family or outside supports as a child and adolescent, Mr. James was destined for adversity. Though he sought help, time and again, Part III, *infra*, he never received appropriate or effective care. His internal pot simmered until it finally boiled over, leaving catastrophe in its wake.

Mr. James was born in 1959 and raised in the Bronx in the 1960s-1970s, where crime and the burgeoning drug epidemic took hold and choked his community. The youngest of four older sisters and one older brother, tragedy enveloped the James family before he was even born. In 1954, his older brother Philip died at age four, falling from the roof of the family's apartment building. From the street, two older sisters (still quite young at the time) and an aunt helplessly saw him fall and witnessed his death. None of them recovered from the horror, which became a generational trauma. In 1955, his mother was diagnosed with lung cancer. Mr. James was born four years later to a dying, depressed mother overcome by stress and tragedy. To make matters worse, her husband, Frank's father, was abusive. An alcoholic, he translated his ire towards his son Frank and his fragile wife into physical and emotional violence. In the middle of the night, his mother would bring Frank into the bedroom shared by his four sisters in an effort to escape his ferocity. Between surviving an abusive husband, raising five children, grieving the loss of her older son, and battling cancer, Ms. James was unable to provide the nurture Frank—and every child—required and deserved. In 1965, when Frank was six, she died.

Alone now with five children, Mr. James's father decided to split up his children, sending the girls to live with various family members, and keeping Frank at home. His father's alcoholism and abuse worsened. He became fiercely overprotective, refusing to let Mr. James leave the home. He beat him relentlessly, leaving formative and lasting memories, and leaving him terribly afraid. By the time he was in high school, Mr. James was experiencing severe signs of significant mental illness, requiring hospitalization. He tried to leave his father's home in his twenties, but recurring mental health crises and an inability to live independently drove him back. Mr. James, quite unstable himself, became his father's primary caretaker as the older man succumbed to heart disease. In 1993, his father was discharged from the VA hospital and died the same night.

Without the nurture and support needed to grow from a child into a successful adult, and plagued by mental illness, poverty, and racism, Mr. James struggled mightily. Though quite intelligent, he was unable to hold down jobs, further his education, or form meaningful relationships. His paranoid schizophrenia refracted his view of everyone around him, from coworkers to supposed treatment providers to strangers walking down the street. He became consumed by conspiracy and end-of-days theories. He tried to escape his demons by moving from city to city, hoping to outrun them. That proved impossible, because they were internal. When he arrived at a new place, he felt that the word on him had beat him there. Without steady work or companions, he frequently experienced homelessness. Unsurprisingly, given his genetic predisposition and his material reality, he developed his own deepening dependence on alcohol, which over time became severe. He retreated fully inward, isolating himself to the point where his only human interaction was via YouTube. In all of his videos, he is paranoid, drunk, and plainly unwell.

The Frank James who introduced himself to the world on April 12, 2022 suffered from severe alcoholism and severe and untreated paranoid schizophrenia. He was living in transient housing on Social Security Disability income ("SSDI"). He had long ago turned away from his sisters, nephews and cousins, who, in their own sometimes-addled ways, had attempted to reach him (and continue to love and care for him). *See* Sentencing Memorandum Supplement (sealed). He felt alone in the truest sense, with no reason to live.

## III. Mr. James is a Severely Mentally Ill Man Who Did Not Receive Proper Care Despite Continually Seeking Help

Sixty-four year old Mr. James has battled severe mental illness his entire life, and was first hospitalized at only fifteen. *See* Exs. A, B (Report of Forensic Psychiatrist Bhushan S. Agharkar, MD), C (Report of Clinical Psychologist Marlyne K. Israelian, Ph.D), D (Excerpt of SSDI Records). As a student at DeWitt Clinton High School, his high school guidance counselor referred him to Lincoln Hospital. A Black teenager, hallucinating alone at the hospital, in the throes of a psychotic break, the doctors admitted him to the psychiatric ward and injected him with the potent sedative Thorazine. He was seen weekly for this medication. The treatment was clearly unsuccessful. By eighteen, he was exhibiting such disturbing behavior that a train conductor hit him in the head with a stick to subdue him. He was brought back to Lincoln Hospital and sedated with Haldol, another antipsychotic. In 1980, when he attempted to attend

college, another psychotic episode led to psychiatric hospitalization at Grady Memorial Hospital in Atlanta, where he was medicated and held as an inpatient for two weeks before being discharged without a treatment plan in place. He returned to New York, where his psychotic symptoms worsened to the point where he heard voices through the local radio station. He set a kerosene fire to the radio station to try to make the voices stop, resulting in his first incarceration for a one-year term. PSR ¶ 136. In his cell on Rikers Island, he attempted to commit suicide by hanging himself. He was 21.

In the 1980s, Mr. James found some transient relief through a day treatment program at Lincoln Hospital. Attending five days a week, he found some stability. He enrolled in trade school to become a machinist and became quite proficient. For the first time, he secured his own apartment, lived on his own, and was hopeful about the future. This period of relative calm and external success was short-lived. His job required a long and stressful commute. He could not attend his day treatment and work at the same time. His paranoia crept back in until it overcame him and he was fired. He found other machinist jobs, but he continually felt ridiculed and targeted by his coworkers. His boss moved him to the night shift to avoid other people. He was fired from that job, too, and every other machinist job he tried to work. By 1991, he was homeless and drinking heavily. Attempts at mental health and substance abuse treatment failed.

By 1993, Mr. James was desperate for help. Decades of records document his efforts at securing mental health treatment. He reported having "been depressed for a long time," lacking a support system, that he had no friends, and a history of psychiatric hospitalizations. Ex. D at 1. On October 20, 1993, he was diagnosed with chronic paranoid schizophrenia, with signs of major depression, auditory hallucinations, and paranoid delusions. *Id*. at 2. He reported himself "open to treatment" and accepted a treatment plan for supportive psychotherapy and pharmacology. *Id*. at 3. He was referred to SVTN-CHMC, now Montefiore Medical Center. He reported psychiatric history dating back fifteen years, coinciding with alcohol abuse, which "led him to seek and enter therapy." *Id*. at 14-16. In 1994, he recalls first receiving SSDI for schizophrenia and major depression for several years.

In 1997, Mr. James enrolled in Bridgeway House, a behavioral health clinic in Elizabeth, New Jersey. From 1997-1998, he was a client, receiving services; from 1999-2006, he was an employee, working in the maintenance department. His Bridgeway experience was a turning point, negatively. It was the longest he had ever held down a job, before or since, but he experienced relentless harassment and racism. Staff spread rumors about him that he became convinced follow him to this day. He left Bridgeway and left the New York/New Jersey region, cycling out of clinics, hospitals, and homeless shelters in Philadelphia, PA; Wilmington, DE; Miami and Jacksonville, FL; Columbus, OH; Chicago, IL; and Milwaukee, WI.

In 2007, Mr. James reported to the Essex Diagnostic Group, seeking psychiatric care, reporting living by himself and having difficulty sleeping, bouts of anxiety, a history of depression and alcoholism, and an inability to hold down jobs. *Id*. at 17-19. A 2009 social work progress note relays that he "is known to social services" and living at the Salvation Army. *Id*. at 20. He reported depression and difficulty being around people. *Id*. at 21. Yet his impairment was found by the clinician to be "not severe." *Id*. Homeless, he received all of his medical care in the

Emergency Room. *Id*. at 23. By March 2010, he was diagnosed once more as a paranoid schizophrenic. *Id*. at 24. When asked "are there any sorts of regular things that you think most people do every day that you find difficult?" he responded "being around people." *Id*. at 26-27. "I don't visit anyone and no one comes to see me." *Id*. at 27. Friends "just wanted to use me for what they could get." *Id*. "I think I am different than other people." *Id*. "I think about the past a lot and what I've lost and why, sometimes I can't think of anything else." *Id* at 28. "I have been having a tough time for a long time." *Id*. at 29. He was reinstated to SSDI benefits in 2010, with several years of back pay.

At MDC-Brooklyn, despite his fifty-year documented mental health history, Mr. James is categorized as "Mental Health Care Level 2," requiring outpatient contacts every one-to-six months. Ex. E (Excerpt of Medical Records) at 1; *see* Federal Bureau of Prisons, "Care Level Classification for Medical and Mental Health Conditions or Disabilities" (May 2019), *at* https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf. He has been provided a do-it-yourself workbook and an MP3 player to listen to meditations. Ex. E at 1-2. His therapy, such as it is, consists of a monthly, cursory check-in, where he is simply asked if he is okay. *See, e.g.*, *id.* at 3-4 (twice, monthly counseling consisted of psychologist speaking to Mr. James while he was typing emails to undersigned counsel). He is not receiving psychiatric medication.

Doctors Bhushan Agharkar, MD and Marlyne Israelian, Ph.D. evaluated Mr. James, both concluding that he suffers from chronic schizophrenia. Ex. B at 8-9; Ex. C at 25-28. Dr. Agharkar, a psychiatrist, found significant deficits subsequent to "a long history of untreated mental illness and head injuries." Ex. B at 8. His "psychotic symptoms are consistent with schizophrenia," such as "hearing the radio in his head, thought broadcasting, ideas of reference thought insertion, and grandiose delusions." *Id*. at 9. He referred Mr. James to Dr. Israelian for a neuropsychological assessment, as his neurological screenings indicated the possibility of brain damage. *Id*. at 8. Dr. Israelian found that "his verbal reasoning abilities are much better developed than his nonverbal reasoning abilities." Ex. C at 12-13. While his verbal comprehension is in the high average range, *id*. at 13, his processing ability, visual analysis and synthesis, visual-spatial perception and organization, mental manipulation and numerical reasoning, and motor speed are all in the thirteenth through sixteenth percentiles relative to his peers. *Id*. at 15-16. Most alarmingly, Mr. James scored below the one percentile on the Rey-Osterreith Complex Figure Test, which is strongly correlated to schizophrenia. *Id*. at 19. When asked to copy a drawing, he was "grossly deficient." *Id*. Combined, his performance on neurological assessments, for which he was found to put forth his best effort, confirmed schizophrenia absent adequate mental health treatment. *Id*. at 25.

Dr. Israelian concluded, "Mr. James has exhibited a broad range of long-term behavioral, mental, and emotional disturbances beginning at, or about, 15-years of age and these disturbances have led to significant impairment in social, educational, and occupational functioning despite otherwise high average word knowledge, general knowledge, conceptual reasoning, and the ability to learn and remember verbal information." *Id*. at 26. "Mr. James was not capable of realizing his hopes and dreams." *Id*. "Mr. James may have been in and out of treatment settings, but he could not have gotten the help he needed." *Id*. at 27. "The

circumstances which led to the actions for which Mr. James presently faces sentencing are indeed largely due to an inadequate mental health system." *Id*.

By 2022, Mr. James was overcome with an unproductive helplessness, anger, and psychiatric illness. He returned to the city that raised him, and, for thirty years, harmed him directly and through its agents' negligent failure to act. Out of control, and very sick, Mr. James cried out in a way that he knew, this time, would be heard.

## IV. Mr. James is Elderly and Suffers from Myriad Physical Health Conditions

At sixty-four years old, with a severe mental health history, lack of treatment, and having endured significant periods of homelessness, Mr. James suffers from significant physical health conditions as well. Born Black and male in the United States, Mr. James is already nearing his at-birth life expectancy of 70.8 years. *See* Figure 14, Latoya Hill, Nambi Ndugga and Samantha Artiga, "Key Data on Health and Health Care by Race and Ethnicity," *KFF* (March 29, 2023), *at* https://www.kff.org/racial-equity-and-health-policy/report/key-data-on-health-and-health-care-by-race-and-ethnicity/. Incarcerated for the indefinite future, he can be expected to age far more rapidly than his chronological peers outside of prison. In a large study of 7974 individuals from 1979-2018, incarceration was associated with a 65% higher mortality rate among Black participants. Benjamin J. Bovell-Ammon, MD, MPH *et.al*, "Association of Incarceration With Mortality by Race From a National Longitudinal Cohort Study," *JAMA Network Open* (Dec. 23, 2021), *at* https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2787436.

Mr. James's physical health conditions are numerous: in addition to alcoholism and schizophrenia, he suffers from obesity, hypertension, hyperlipidemia, gastroesophageal reflux, sleep apnea, podiatric diseases, tinnitus, and vision impairments. Ex. E at 5. At MDC Brooklyn, he is prescribed, and takes as directed, atorvastatin (for hyperlipidemia), gabapentin (for pancreatitis), amlodipine and aspirin (for hypertension), famotidine (for reflux), magnesium and calcium carbonate (for reflux and heartburn). *Id.* at 6-7.

Most recently, Mr. James spent August 28-September 8, 2023 in NYU Langone Brooklyn and the Brooklyn Hospital Center. On August 26, 2023, he began suffering debilitating abdominal pain. He collapsed on the floor of his housing unit and was told by his unit team that due to a staff shortage, there was no one who could see him. On August 27, 2023, he was evaluated by a nurse in Health Services. *Id.* at 8-9. He reported abdominal pain, and due to the sudden onset, he thought he was being poisoned. *Id*. at 9. The nurse prescribed Tylenol and referred him to psychology for follow-up, clearly not taking the pain seriously. *Id*. The next morning, he returned to Health Services, reporting that he had vomited eight times and that the pain had become sharp. *Id*. at 10-12. The doctor responded to his abdominal pain by conducting an EKG, which registered new Q waves and sinus tachycardia. *Id*. at 12. Mr. James was taken by EMS to NYU Langone Brooklyn as a cardiac patient. There, doctors ruled out acute coronary syndrome, such as a heart attack. *Id*. at 14. Rather, a CT scan of his abdomen revealed acute pancreatitis. *Id*. On August 28, 2023, he was transferred to Brooklyn Hospital Center, where he was admitted. *Id.* at 13. Further testing confirmed acute pancreatitis as well as gallstones, consistent with his initial self-report. *Id*. at 14-15. He underwent laparoscopic gallbladder

surgery on September 6, 2023, and was discharged back to MDC Brooklyn on September 8, 2023. *Id*. at 15-17. All told, for what is generally a routine one-night hospital stay, Mr. James spent eleven nights in the hospital. When he returned to MDC-Brooklyn, he did not receive his hospital prescribed medication for five days, only receiving his medication upon the intervention of undersigned counsel. *See id.* at 31-37 (performing medication reconciliation on September 13, 2023 despite returning to MDC on September 8, 2023 and seeing doctor on September 11, 2023).

## V. **The Bureau of Prisons is Ill-Equipped to Manage Mr. James's Complex Medical and Mental Health Problems**

Given his age and health, chronic and acute physical and mental health problems like those Mr. James experienced just this month will reoccur as he serves his time in the Bureau of Prisons ("BOP")—a particularly unfortunate place to be a patient. The BOP is notoriously poor at providing adequate medical care to inmates with chronic medical conditions, such as Mr. James. *See, e.g.,* Walter Pavlo, "Federal Bureau of Prisons' Medical Care Falls Short Of Its Own Policy," *Forbes* (Apr. 19, 2022), *at* https://www.forbes.com/sites/walterpavlo/2022/04/19/federal-bureau-of-prisons-medical-care-falls-short-of-its-own-policy/ (discussing Office of the Inspector General reports of BOP's lack of any system to track medical care needs, such as length of time to take an inmate to a necessary outside medical appointment).

Courts repeatedly have recognized that because of the vagaries of staffing shortages, funding issues, security issues, and administrative failures, federal inmates are not able to receive the consistent care needed to keep a chronic medical condition from becoming an acute medical condition. *See, e.g*., *United States v. Topps*, 17-CR57 (SLG) (D. Alaska Oct 24, 2022), ECF No. 96 (BOP unable to treat chronic medical issues of 63 year old defendant with obesity, heart disease, hypertension and a urological condition); *United States v. Thrower*, 495 F. Supp. 3d 132, 137 (E.D.N.Y. 2020) (noting BOP's inability to care consistently for defendant suffering from dementia, cognitive deficits, hypertension, and diabetes); *United States v. Beras*, 2020 WL 7496354, at *2 (S.D.N.Y. Dec. 20, 2020) (noting BOP's inability to care for defendant's chronic conditions—including hypertension, hyperlipidemia, glaucoma, and chronic nasal infection); *United States v. Rice*, 2020 WL 4505813, at *3 (S.D.N.Y. Aug. 5, 2020) (finding that defendant's medical conditions, including lymphoma, chronic angle-closure glaucoma, chronic obstructive asthma, COPD and hypertension were not adequately able to be cared for in BOP). The United States Sentencing Commission's recent amendment to the Sentencing Guidelines that adds a category of "medical conditions requiring long-term care" to the bases upon which a Court can reduce a defendant's sentence demonstrates the Commission's awareness of the BOP being unable to provide such care adequately. *See* Amend. 814, U.S. Sentencing Commission (Apr. 2023).

Psychiatric care in the BOP for inmates with serious mental health issues, such as Mr. James, is, if possible, even worse than the medical care. *See, e.g.*, Pavlo (2022) (discussing internal BOP complaints about the lack of regular provision of psychiatric medications to inmates); Christie Thompson and Taylor Elizabeth Eldrige, "Treatment Denied: The Mental Health Crisis in Federal Prisons," *The Marshall Project* (Nov. 21, 2018), *at* https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-

federal-prisons (discussing the decrease in mental-health staffing in BOP and reduction in number of inmates BOP deems in need of mental health care). The Office of the Inspector General detailed BOP's failures to adequately document inmates' mental health issues and the frequent resort to the use of solitary confinement for extended periods to "manage" defendants with severe mental illness. *See* United States Department of Justice, Office of the Inspector General, "Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness" (July 12, 2017), *at* https://oig.justice.gov/reports/2017/e1705.pdf. While approximately 40% of inmates have a history of mental health issues, *see id*., Prison Policy Initiative Research found that 66% of federal prisoners reported not receiving any mental health care while incarcerated. Prison Policy Initiative, "Mental Health" (Sept. 5, 2023), *at* https://www.prisonpolicy.org/research/mental_health/. These issues have fostered great concern among federal judges. *See, e.g., United States v. Divine Johnson*, 16-CR-319 (NGG), 2023 WL 3093617 (E.D.N.Y. Apr. 26, 2023) (detailing BOP's inability to provide even basic substance abuse and mental health treatment to defendant with PTSD, borderline personality disorder and opioid disorder); *United States v. Gonzalez*, 19-CR-90, 2020 WL 7024905, at *7 (D. Conn. Nov. 30, 2020) (BOP unable to provide intensive mental health treatment).

Notorious inmates such as Mr. James appear to fare particularly poorly in the BOP, raising cause for alarm. *See, e.g.*, Glenn Thrush, "Kaczynski Is Said to Have Died by Suicide in Prison," *The New York Times* (June 10, 2023), *at* https://www.nytimes.com/2023/06/10/us/politics/kaczynski-unabomber-suicide-prison.html; Glenn Thrush and Serge F. Kovaleski, "Investigation Finds Errors and 'Incompetence' Led to Whitey Bulger's Death," *The New York Times* (Dec. 7, 2022), *at* https://www.nytimes.com/2022/12/07/us/whitey-bulger-justice-inspector-general.html; Diana B. Henriques, "Bernard Madoff, Architect of Largest Ponzi Scheme in History, Is Dead at 82," *The New York Times* (Ap. 14, 2021), *at* https://www.nytimes.com/2021/04/14/business/bernie-madoff-dead.html; William K. Rashbaum, Benjamin Weiser and Michael Gold, "Jeffrey Epstein Dead in Suicide at Jail, Spurring Inquiries," *The New York Times* (Aug. 10, 2019), *at* https://www.nytimes.com/2019/08/10/nyregion/jeffrey-epstein-suicide.html.

## VI. The Sentence Length Will Materially Impact Mr. James's Conditions of Confinement, Despite the Unlikelihood of His Survival

Ultimately, given his age, race, mental and physical health, and the harm he caused, Mr. James will not survive his prison term. A properly-calculated top-of-the-Guidelines sentence of eighteen years would set his release date into his eighties. Accordingly, the specific length of Mr. James's sentence will do less to ensure that he spends the rest of his natural life in prison—time and poor medical and psychiatric care will do that work—and more to determine his conditions of confinement. The relevant Federal Bureau of Prisons Program Statement requires that "a male inmate with more than 30 years remaining to serve (including non-parolable LIFE sentences) will be housed in a High security level institution unless the PSF [Public Safety Factor] has been waived. A male inmate with more than 20 years remaining to serve will be housed in at least a Medium security level institution, unless the PSF has been waived." *See* Federal BOP, "Program Statement 5100.08: Inmate Security Designation and Custody Classification," (Sept. 12, 2006), *at* https://www.bop.gov/policy/progstat/5100_008.pdf (see Chapter 5, Page 9).

At MDC-Brooklyn, Mr. James has proven through his actions that he is not a risk of prison violence. Despite the notoriety of his criminal case, and his severe mental illness, he has sustained only one minor, 300-level disciplinary infraction in seventeen months, for Refusing to Obey an Order/Being in an Unauthorized Area—he did not hustle into his cell and lock its door as quickly as the guard would have liked. PSR ¶ 160. He has posed no danger. Other than sentence length, Mr. James has no other factors mandating a prison that will severely curtail his ability to move around. *See id*. at Chapter 4, Page 16. Though his offense is surely severe and he has a history of alcoholism, registering designation points, he has a criminal history score of zero, no history of violence, no history of escape or attempts, he is over 55 years old, and he has his GED. *Id*. His sentence length, then, will almost fully determine his conditions of confinement.

According to Dr. Israelian, Mr. James "may not pose a threat to himself or others, but he remains mentally ill and brain damaged. He needs access to ongoing medication management for his psychotic symptoms and he needs access to meaningful mental health counseling. With respect to sentencing, particular care must be taken to place Mr. James in the type of setting that is least likely to exacerbate his symptoms of schizophrenia." Ex. C at 27. "While it is important for Mr. James to have some interaction with other inmates, it is extremely important that he have the opportunity to retreat when necessary." *Id*. at 28.

## VII. <u>A Legitimate Sentence Here Speaks Truth to the Parsimony Clause</u>

"The Court shall impose a sentence sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). These words, uttered in every federal sentencing proceeding, have profound applicability here. How many years beyond his natural life must Frank James repay the United States that are not greater than necessary? The nature and circumstances of his offense are severe, calling out for retribution and incapacitation. *Id*. at 3553(a)(1). But his history and characteristics—a minor, ancient misdemeanor record; severe and untreated mental illness, for which he frequently sought help; his age and infirmity—push downward, in favor of mercy. Mr. James does not require deterrence or rehabilitation: he will have no opportunity to recidivate. He is elderly, sick, and severely mentally ill. Sentences of thirty, forty, fifty—or life-plus-ten years-plus an upward departure, as the PSR calculates, PSR ¶¶ 187, 200—are all the same sentence: certain death-in-prison for a non-homicide. By definition, a sentence of that type is greater than necessary, serving no legitimate penological purpose.

As he will explain in his remarks, Frank James feels significant and genuine remorse for the harm he caused. From the very first day of his case, he has expressed how grateful he is that no one died, and has frequently explored ways to begin to make amends to the victims. To the extent he is able to contribute, Mr. James hopes to help bring closure and justice to those who suffered, unfairly, from his unthinkable response to his pain. He never sought a trial: requiring the victims to testify was unimaginable to him, and never a possibility.

It is natural and tempting to begin and to end the sentencing inquiry on April 12, 2022. Mr. James brought horror to his victims and to the city at large. His actions will be carried in their mental and physical scars and in all of our city forever. But his story began long before that

day. Mr. James deserved better than the life he lived: he deserved two parents who would love, care for, and nurture him, rather than zero; he deserved a mental health system that provided him legitimate and appropriate treatment, rather than temporarily drugging him and sending him on his way; he deserved to be heard by someone who could adequately answer his cries, rather than his few YouTube followers. Instead, Mr. James was cast aside until he found a devastating way to make himself seen, through actions born of paranoid schizophrenia. He will carry that weight behind prison bars for the rest of his life. We seek only a sentence that carefully balances the aggravating and mitigating factors, both significant. He will not survive 18 years in the BOP, short of a miracle. It is sufficient, but not greater than necessary.

Thank you for your consideration.

Respectfully submitted,

/s/

Mia Eisner-Grynberg, Esq.
Assistant Federal Defender
Eastern District of New York
(718) 330-1257

cc: AUSA Sara K. Winik (by email and ECF)
AUSA Ellen H. Sise (by email and ECF)
Senior United States Probation Officer Roberta Houlton (by email)