

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMP:SKW/EHS
F. #2022R00326

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 20, 2023

<u>By E-mail and ECF</u>

The Honorable William F. Kuntz, II
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Frank James
     <u>Criminal Docket No. 22-214 (WFK) (S-1)</u>

Dear Judge Kuntz:

   The government respectfully submits this memorandum in advance of the sentencing hearing in this case, which is scheduled for September 28, 2023. For the reasons detailed below, including the careful and prolonged planning that went into the defendant's mass shooting and the serious harm he inflicted on his victims and the community, the government respectfully recommends that the Court sentence the defendant to ten concurrent sentences of life imprisonment on Counts One through Ten and a mandatory consecutive sentence of 120 months' imprisonment on Count Eleven. The government also respectfully requests that the Court adopt the U.S. Probation Department's ("Probation") Presentence Investigation Report ("PSR") in its entirety.

  I.  <u>Factual Statement</u>

   A. <u>The Defendant's Mass Shooting</u>

   At approximately 8:26 a.m. on Tuesday, April 12, 2022, during the height of the morning commute, the defendant fired approximately 32 shots at victims on a crowded N train subway car in Brooklyn.

   The defendant disguised himself to look like a construction or Metropolitan Transportation Authority ("MTA") worker by wearing a yellow hard hat and orange reflective jacket. On the train, the defendant acted strategically to position victims at the opposite end of the subway car, creating a "kill funnel" into which he could shoot, and avoid the prospect that a nearby subway passenger would wrest the firearm away from him. First, the defendant told passengers who tried to sit next to him that the seats were wet, causing passengers to move away from the defendant. Then, the defendant set off a smoke grenade which filled the train with heavy smoke

and caused panicked passengers to flee to the far end of the subway car.

Once all the passengers were packed together at the far end of the subway car, the defendant began firing his semi-automatic Glock 17 pistol at his victims. When the defendant started shooting, the train was between stations and then temporarily stalled, leaving victims trapped, with nowhere to run or hide. The defendant used a semi-automatic gun with an extended magazine and was able to fire bullets in rapid succession without taking time to reload. Each bullet the defendant fired, however, required an individual trigger pull. Therefore, the defendant chose to shoot 32 separate times at his defenseless victims. It was only because the defendant's gun eventually jammed that the defendant stopped shooting, despite having two additional fully-loaded extended magazines capable of firing an additional 36 bullets.

Ultimately, at least 16 of the 32 bullets that the defendant fired hit ten victims before the defendant's gun jammed. As discussed in the PSR, five victims required at least one emergency surgery to treat their gunshot wounds. See PSR ¶¶ 47-58. The medical evidence shows that several of the victims likely would have died from their gunshot wounds had they not been rushed to the hospital and received life-saving surgeries. Additional victims were seriously injured from smoke inhalation and in the chaotic struggle to flee from the defendant's gunshots. Multiple victims still suffer from ongoing physical and mental injuries due to the attack. Notably, most of the bullets the defendant fired were at seat height or higher, and thus aimed where victims would be expected to be sitting or standing. Below is a photograph of the trajectory of the defendant's gunfire which was aimed to kill the passengers on the train.



The defendant's attack took place during the morning rush hour, and the subway car was full at the time the defendant began shooting. Passengers in the subway car included children on their way to school, families, pregnant women, college students, and hard-working New Yorkers heading to work. Multiple passengers had recently fled war-torn countries and arrived in New York in hopes of safety and economic opportunities. As a video taken by a

passenger trapped on the train shows, many passengers were screaming for help, barely able to see because of the smoke, and bleeding heavily from wounds suffered during the defendant's attack. One victim described the shooting in detail, writing the following about her experience during the attack:

> The train car quickly filled with smoke and everyone began to panic as we all rushed to try and exit the train. Moments later was when the pop, pop, pop sounds began. At first I thought it was fireworks. It seemed like they went on forever. People were screaming and crying for help, several people were saying there was so much blood, calling out for help. The smoke made it hard to breathe and I pulled my hoodie down over my face to provide another layer of filtration. There was another round of the pop, pop, pops which at that point I had a feeling that these were gunshots. The train stopped, I peeked out of my hoody praying that we were at the station but we were not, we were still in between the two stations. I prayed. I prayed that God would protect us. I prayed that this would end soon. I prayed that the train would start moving.
>
> People were yelling to break the doors open. The door at the end of the car was locked and we could not get out. I could feel bodies piled upon each other. I tried not to breathe. Someone said stay calm. The train started to move again. When we pulled into the station and the doors opened, everyone exited the train as quickly as possible. I sat there for a few moments as the smoke began to clear and assess what was around me. The floor was covered in blood. There were a set of keys on the floor that I picked up thinking someone would need those to get home. As I exited the train, I noticed several people laying down on the ground that had been injured. I put my hands on my knees, took a few deep breaths, and then looked to see who needed the most help.

See Victim Impact Statements, filed separately under seal.

As this victim described, eventually, the train pulled into the 36th Street subway station, in Sunset Park, Brooklyn, the doors opened, and the passengers and victims poured onto the platform, screaming for help, and running for safety. Below is a photograph of the train car taken by a passenger soon after the train arrived at the 36th Street subway station.



      After the train doors opened, several gunshot victims and passengers stayed on the 36th Street subway station platform awaiting medical help.  Multiple passengers immediately identified the shooter as an individual wearing an orange reflective jacket and hard hat.  Below is a photograph of the 36th Street subway station platform after medical professionals treated the gunshot victims.



After the N train arrived at the 36th Street station, the defendant shed his disguise to avoid detection. Specifically, the defendant threw his yellow hard hat in the 36th Street subway station garbage can, as depicted below in the image on the right, and discarded his orange reflective jacket on the 36th Street subway platform floor. Then, along with many other scared passengers and gunshot victims, the defendant boarded an R train, which was waiting across the platform, and departed the scene of the attack. A few minutes later, the R train arrived at the next stop—the 25th Street subway station—and the defendant calmly exited the subway station without being detected. Below on the left is a still image from a surveillance camera of the defendant, without his disguise, exiting the 25th Street subway station approximately 15 minutes after the shooting.

 

B. <u>Evidence Recovered from the Subway, the Defendant's Storage Unit, and the Defendant's Apartment</u>

Evidence collected from the scene of the attack overwhelmingly tied the defendant to the mass shooting. As depicted in the photograph below, the defendant left his Glock 17 and an ax on the subway car. DNA analysis confirmed that the defendant's DNA was on both the Glock 17 and the ax.



Records provided by the Bureau of Alcohol, Tobacco, Firearms and Explosives further revealed that the defendant lawfully purchased the Glock 17 in Ohio in his own name. In addition, ballistic analysis confirmed that the shell casings found on the subway car matched the pin impression from the defendant's Glock 17 pistol, indicating that the Glock 17 pistol fired the bullets on the subway car.

The defendant also left behind his cellphone, bank cards in his name, a bag full of fireworks soaked in gasoline, and a U-Haul key to a van he had rented the day before. Records from U-Haul, surveillance cameras, and cell site data confirmed that in the early morning hours of April 12, 2022, the defendant drove his rented U-Haul van from Philadelphia, Pennsylvania to Brooklyn, New York to carry out the attack.

A search of the defendant's storage unit in Philadelphia uncovered a pistol barrel, targets, and ammunition used with an AR-15 semi-automatic rifle, among other items. In addition, a search of the defendant's short term rental apartment in Philadelphia uncovered an empty magazine for a Glock handgun, a taser, a high-capacity rifle magazine, and a blue smoke cannister, among other items.

C. Evidence of the Defendant's Significant Preparation and Planning for the Attack

The government's investigation revealed that the defendant began preparing for his April 12, 2022 attack years earlier. Indeed, the attack was meticulously planned over a matter of months and years, contrary to the defendant's arguments in his sentencing submission. The defendant did not "snap," and suddenly decide to turn his firearm on innocent victims riding the subway train, as he claims in his sentencing submission. See Defense Sentencing Letter (Def. Ltr.") ECF No. 81, p. 1. And he was not driven by "hallucinations" as his submission misleadingly

implies.  See id.  The defendant, knowing exactly what he was doing, carefully planned his mass shooting over the course of several years in order to kill unsuspecting victims.

For example, according to PayPal payment records, on or about January 8, 2017 and June 29, 2019, the defendant purchased Enola Gaye EG18X smoke grenades using his PayPal account.  The defendant used the same brand of smoke grenade in the subway attack.  According to records from a firearms supply company ("Firearms Supply Company-1"), on or about October 23, 2019, the defendant purchased multiple boxes of Underwood Xtreme Defender 9mm Luger +90 Grain ammunition, the same brand of ammunition that the defendant used in the attack.  In addition, on or about May 17, 2021, the defendant purchased a KwikSaftey yellow hard hat using his Amazon account, which he wore as a disguise during the attack.

Surveillance video and cell site data also showed that in the months leading up to the attack the defendant took multiple trips to New York City to take practice runs on the subway system to prepare for the mass shooing.  For example, on March 31, 2022, the defendant spent almost the entire day—from approximately 5:30 a.m. to 9 p.m.—riding on various subway lines, including the N train in Brooklyn, the same subway line on which the defendant carried out the attack.  The defendant took similar practice runs on the subway on April 1, 2022 and April 9, 2022.

The defendant's Google search history also shows that he prepared for and planned the attack well in advance.  For example:

a. On or about March 19, 2022, the defendent conducted Google searches for the phrases "gun shops near Columbus Ohio" and "can I buy a gun in Ohio if I'm not a resident."

b. On or about March 21, 2022, the defendant searched for the name of the storage facility that the defendant visited the day before the attack.

c. On or on about April 1, 2022, the defendant searched for "MTA," "New York," "transit," and "stops on the N train."

d. On or about April 6, 2022, the defendant searched for "311 kings highway Brooklyn ny," which is near where the defendant parked the U-Haul van before entering the N street subway station on April 12, 2022.

The defendant's prolonged planning is also reflected in videos that he created and saved on his phone or posted on YouTube under the pseudonyms profitof_doom8888 and prophet_oftruth88.  For example, in a YouTube video that the defendant posted July 3, 2021— about nine months before the attack—titled "Ready, Set, Go," the defendant made the following statements:

a. "I have decided on something because I believe the space and time to be able to take my time to mount the proper response to what I've gone through over the years and I call it simply 'Ready, Set, Go.'"

b. "This is all about retaliating and revenge for being attacked by mother*****s."

c. "You have to put yourself in position that you're not just ready, but you're set to go, so that you get the maximum impact, maximum bang for your buck that you plan to do. And sometimes that takes time. Thirty years ago, I wasn't ready to respond."

d. "The shit that I'm thinking about, I have a lot of moving parts to my shit, so I have to make sure they're set to go, so I have to make sure they don't fizzle out or they don't miss deploy or some shit" . . . "If you keep f***ing with me, one or both of us is not going to be on this earth anymore, which is going to be a good thing because there's too many beings on this earth anyway. A healthy human population is . . . less than a billion people."

Similarly, in a video posted on August 5, 2019, discussing traveling to New York, the defendant stated, "[A]t the very least it's going to be very interesting. Let me say that. It's going to be very interesting what happens in New York with me." In another video from July 10, 2019, the defendant stated that the "whole system is coming down" just like the World Trade Center after the September 11, 2001 terrorist attack. In other videos, the defendant stated how people are "better off dead" and repeatedly discussed how the human population has to be reduced to survive. The defendant also made statements indicating that he had "nothing to lose" due to his age.

In addition, three months before the attack, in January 2022, the defendant saved an audio file on his phone in which he discussed an imminent attack. Speaking about his death and an unspecified big event, the defendant made the following statements:

a. "You're going to know for a fact that I'm gone, they'll be no question about that . . . when I go out of this mother****r . . . everyone's gonna know it was me."

b. "If you hear the name Frank James on the news, if something happens to a Frank James that's sixty-something years old, chances are that's me."

c. "Download my videos while you can because they're probably going to delete my channel."

Then, as noted above, on the morning of the defendant's carefully planned attack, the defendant disguised himself as an MTA worker to avoid suspicion and so that he could later change his appearance while running from law enforcement. The disguise worked. Numerous victims reported that when they saw the defendant, they thought that he worked for the MTA— giving him legitimacy and helping him camouflage into the fabric of a busy morning commute, enabling him to carry out his attack.

D.  The Defendant's Flight, Arrest, and Post-Arrest Statements

Immediately after the attack, the defendant fled from law enforcement, changing his clothing frequently to evade detection.  Knowing the defendant was still at large, New York City was on high alert.  Schools sheltered in place, parents were called to pick up their children from daycare, and no one knew if other attacks were imminent.

During this time of terror for so many, the defendant roamed the city undetected. After exiting the 25th Street subway station approximately 15 minutes after the attack, he boarded a bus to Park Slope, Brooklyn.  Less than an hour after his attack, the defendant put on a blue face mask, entered a Park Slope deli, and calmly purchased a drink.  The defendant then got back on the bus for a few minutes before exiting again to purchase a black face mask from a bodega. Throughout the rest of the day, the defendant traveled on public transportation from Brooklyn to the Bronx and periodically changed his appearance to avoid detection.  First, the defendant wore a black jacket and a blue face mask.  The defendant then swapped the blue face mask for the black face mask.  The defendant subsequently took his jacket off and wore a yellow tee-shirt and grey baseball hat.  Sometime later, the defendant switched his clothing again to a black long-sleeve shirt and dark baseball hat.

After traveling to the Bronx, the defendant made his way to Newark Penn Station in New Jersey where he spent the night.  The next morning, the defendant changed his clothes again and took the PATH train from New Jersey to New York, where he traveled to the East Village in Manhattan.

At some point after the shooting, the defendant purchased a burner phone which he used to closely follow the coverage of his attack while hiding from law enforcement.  For example, the defendant watched 31 videos of news reports about his subway shooting.  The defendant also watched a James Bond chase scene from the movie "No Time to Die" ten times after the attack. Clearly aware from the news reports that he had been identified as the shooter and that his name and photograph had been released to the public, the defendant ultimately turned himself in to the police by calling NYPD crime stoppers on April 13, 2022, the day after the shooting.  NYPD officers subsequently located and arrested the defendant.

After his arrest, the defendant was taken to the NYPD's 9th Precinct and interviewed by law enforcement officers.  The defendant admitted to being on the train but declined to talk about the attack.  When asked if anyone else was in danger or if there were other weapons or bombs that law enforcement should be concerned about, the defendant denied knowing what the law enforcement officer was talking about.

E.  The Defendant's Charges and Guilty Plea

On April 14, 2022, the defendant was arraigned on a complaint charging him with committing a terrorist attack or other violence against a mass transportation system and vehicle carrying passengers and employees, in violation of Title 18, United States Code, Sections 1992(a)(7) and (b)(1).  He was ordered detained at the Metropolitan Detention Center (the "MDC").  See Docket No. 22-MJ-429 (RLM).

On May 6, 2022, a grand jury sitting in the Eastern District of New York returned an indictment charging the defendant with committing a terrorist attack or other violence against a mass transportation system and vehicle carrying passengers and employees, in violation of 18 U.S.C. §§ 1992(a)(7), (a)(10), (b)(1), (c)(1), and (c)(2), as well one count of using a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (c)(1)(A)(ii), and (c)(1)(A)(iii). See Docket No. 22-CR-214 (WFK) at 15.

On December 16, 2022, a grand jury sitting in the Eastern District of New York returned a superseding indictment charging the defendant with ten counts—one for each gunshot victim—of committing a terrorist attack or other violence against a mass transportation system and vehicle carrying passengers and employees, in violation of 18 U.S.C. §§ 1992(a)(7), (a)(10), (b)(1), (c)(1), and (c)(2), as well as one count of using a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (c)(1)(A)(ii), and (c)(1)(A)(iii). Id. at 56.

On January 3, 2023, the defendant pleaded guilty to all counts of the superseding indictment, without a plea agreement. In his plea allocution, the defendant admitted to shooting his firearm on the subway but falsely claimed that his "intention was to cause serious bodily injury to the people on the train" and that it was "not [his] intention to cause death."

II.   Applicable Law

Title 18, United States Code, Section 3553(a) requires a sentencing court to "determine in each case what constitutes a sentence that is 'sufficient, but not greater than necessary,' to achieve the overarching sentencing purposes of 'retribution, deterrence, incapacitation, and rehabilitation.'" Rosales-Mireles v. United States, 138 S. Ct. 1897, 1903 (2018) (quoting 18 U.S.C. § 3553(a) and Tapia v. United States, 564 U.S. 319, 325 (2011)). "[I]n determining the particular sentence to be imposed" the Court is required to consider both the sentencing factors set forth at § 3553(a)(2), as well as the sentencing range established by the Sentencing Commission for the applicable category of offense and offender. See 18 U.S.C. § 3553(a)(4). Thus, "[a] district court is procedurally obligated to calculate and consider the Sentencing Guidelines in reaching an independent decision as to sentence," United States v. Awan, 607 F.3d 306, 312 (2d Cir. 2010), and "[a] district court should normally begin all sentencing proceedings by calculating, with the assistance of the Presentence Report, the applicable Guidelines range," which "provide the 'starting point and the initial benchmark' for sentencing." United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting Gall v. United States, 552 U.S. 38, 49-50 (2007)).

Although the Sentencing Guidelines are advisory, see United States v. Booker, 543 U.S. 220 (2005), "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)" in determining what sentence to impose, see United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005).

III.     Sentencing Guidelines

The government and Probation agree that the defendant's sentencing Guidelines range for Counts One through Ten is life imprisonment on each count which may run either concurrently or consecutively, plus a mandatory consecutive term of 120 months' imprisonment for Count Eleven.  See PSR ¶ 187.

Each of the offenses in Counts One through Ten carries an offense level of either 37 or 39, based on the extent of the victims' injuries as set forth in the PSR.  See PSR ¶¶ 67-126.

As discussed in more detail below, because the defendant made material and willful false statements under the penalty of perjury at his plea allocution—in which the defendant denied intending to kill his victims—a two-level enhancement for obstructing or impeding the administration of justice pursuant to U.S.S.G. § 3C1.1 is appropriate.  See PSR ¶ 63.

Because the defendant failed to fully accept responsibility for his offense conduct when he falsely claimed he only intended to cause serious bodily injury, the three-point reduction for acceptance of responsibility under U.S.S.G. §§ 3E1.1(a) and (b) does not apply.  See PSR ¶ 64.

Accordingly, the government submits that the PSR sets forth the applicable Guidelines calculation, which is reflected below:

| | | |
|---|---|---:|
| Base Offense Level (U.S.S.G. § 2A2.1(a)(1)) | | 33 |
| Plus: | Counts One, Five, Seven, Eight and Ten: Victim sustained permanent or life-threatening bodily injury (U.S.S.G. § 2A2.1(b)(1)(A)); OR | +4 |
| | Counts Two, Three, Four, Six and Nine: Victim sustained serious bodily injury (U.S.S.G. § 2A2.1(b)(1)(B)); AND | +2 |
| | Willfully obstructing or impeding the administration of justice (U.S.S.G. § 3C1.1) | +2 |
| Total: | | 37 or 39 |

Under U.S.S.G. § 3D1.4, one unit is assigned to the group with the highest offense level—here 39—and one additional unit is assigned for each group that is "equally serious or from 1 to 4 levels less serious" than the group with the highest offense level with a maximum increase of 5 levels.  See PSR ¶¶ 128-130.  Therefore, 5 levels are added to the highest offense level (39), resulting in a combined offense level of 44.  See PSR ¶ 131.

Thus, for Counts One through Ten, the defendant's offense level is 44 (which exceeds the maximum level in the Guidelines Sentencing Table and thus is treated as an offense level of 43) and, because the defendant is in criminal history category I, the defendant's advisory Guidelines sentencing range is life imprisonment.  See PSR ¶ 134.

For Count Eleven, pursuant to U.S.S.G. § 2K2.4(b), the advisory sentence under the Guidelines is a mandatory consecutive sentence of 120 months. <u>See</u> U.S.S.G. § 2K2.4(b); 18 U.S.C. § 924(c)(1)(A)(iii). <u>See</u> PSR ¶ 127.

Therefore, the Guidelines advise imposition of sentence of life imprisonment for Counts One through Ten, followed by a consecutive term of 120 months' imprisonment for Count Eleven. <u>See</u> PSR ¶¶ 150, 187.[1]

For the first time in his sentencing submission, the defendant objects to the PSR's Guidelines calculation which Probation issued on June 29, 2023. Pursuant to Rule 32(f) of the Federal Rules of Criminal Procedure, the parties are required to file objections within 14 days after receiving the PSR. On July 5, 2023, the government filed a letter notifying Probation that it did not object to the PSR and agreed with Probation's Guidelines calculations. <u>See</u> ECF No. 77. The defendant did not file any objections within 14 days of receiving the PSR, respond to the government's letter, or seek a hearing pursuant to <u>United States v. Fatico</u>, 604 F 2d (1053) (2d Cir. 1979) to challenge any facts set forth in the PSR. Only now, on the eve of sentencing, does the defendant for the first time raise issues with respect to the calculation of the Guidelines range, and he still does not request a <u>Fatico</u> hearing.

Because the PSR correctly calculates the defendant's Guidelines range, the Court should adopt the PSR in its entirety and factually find that the defendant: (1) intended to commit murder; (2) obstructed justice when, at his plea allocation, he stated that he did not intend to kill his victims, and find that his statement was material and intentionally false; and (3) failed to accept responsibility for his crimes.

A. <u>U.S.S.G § 2A2.1 Applies Because the Defendant Intended to Commit Murder</u>

The government and Probation agree that U.S.S.G. § 2A2.1, the Guideline for "Assault with Intent to Commit Murder; Attempted Murder," is the applicable Guidelines provision for the defendant's conduct because the evidence proves that the defendant intended to kill his victims.[2] <u>See</u> PSR ¶ 67. In his plea allocution, the defendant falsely claimed that he intended only to cause serious bodily injury—not death—when he set off the smoke grenade and fired 32 bullets on a crowded train. Based on that false claim, the defendant argues that he only acted "recklessly" and therefore the "aggravated assault" provision of U.S.S.G § 2A2.2 should

_____

[1] In August 2023, the U.S. Sentencing Commission promulgated a retroactive amendment to the Guidelines which would decrease a defendant's offense level by two points where a defendant did not receive any criminal history points and the instant offense did not involve specified aggravating factors, such as causing serious bodily injury or the use of violence. Should the amendment pass, it would not be applicable here because the defendant's offense involved serious bodily injury to many victims and the use deadly force with a gun.

[2] According to U.S.S.G. § 2A2.1 Application Note 1, First Degree Murder is defined as the "unlawful killing of a human being with malice aforethought," including "perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being." <u>See</u> 18 U.S.C. § 1111.

apply instead of the "attempted murder" provision of U.S.S.G. § 2A2.1. <u>See</u> Def. Ltr., pp. 2-3. The defendant is incorrect.

The Second Circuit has repeatedly held that firing a gun at someone from a relatively close range is sufficient to establish a defendant's intent was to kill and, therefore, for the sentencing court to apply § 2A2.1 Sentencing Guidelines for attempted murder. <u>See, e.g.</u>, <u>United States v. Stroman</u>, 498 Fed. App'x. 67 (2d Cir. 2012) (holding that video of the defendant pursuing two men into a grocery store and firing his gun at them (without hitting them) was sufficient to prove intent to murder and apply U.S.S.G. § 2A2.1(a)(2)); <u>United States v. Atehortva</u>, 69 F.3d 679, 687 (2d Cir. 1995) (concluding that a district court could find intent to murder and apply U.S.S.G. § 2A2.1 where there was "undisputed evidence that [defendant] repeatedly fired a gun at federal agents from close range"). Other federal courts of appeals have followed suit, applying the attempted murder Sentencing Guideline when a defendant fires at an individual from a short distance. <u>See, e.g.</u>, <u>United States v. Chambers</u>, 719 Fed. App'x. 246, 248-49 (4th Cir. 2018) (affirming district court's application of U.S.S.G. § 2A2.1(a)(2) to a defendant who fired a gun at an individual with whom he had previously had a fight, hitting him in the calf); <u>United States v. Sanders</u>, 472 Fed. App'x. 376 (6th Cir. 2012) (holding district court correctly applied U.S.S.G. § 2A2.1(a)(2) because the fact that the defendant fired a gun at an individual 10-15 feet away and did not hit the individual, paired with testimony that the defendant yelled, "I'm going to blow your ass off," was sufficient to establish intent to kill); <u>United States v. McMorris</u>, 224 Fed. App'x. 549 (8th Cir. 2007) (affirming the application of U.S.S.G. § 2A2.1(a)(2) where defendant grabbed a gun and shot at officers pursuing him from a distance of fifty or sixty feet).

Citing several inapposite cases, the defendant argues that "[m]any courts within this Circuit have refused to apply the attempted-murder Guideline to gun violence cases where the circumstances evince recklessness, rather than a willful intent to kill." <u>See</u> Def. Ltr., p. 3. But, as described below, the facts in the cases cited by the defendant are readily distinguishable from this case. <u>See, e.g.</u>, <u>United States v. Legros</u>, 529 F.3d 470, 474–75 (2d Cir. 2008) (defendant only shot into the air not at people); <u>United States v. Williams</u>, 19-CR-5 (KAM) (E.D.N.Y. Aug. 13, 2019) (no evidence of the distance or angle of a shooting); <u>United States v. Escort</u>, Sent. Tr., ECF No. 58 at 5, 21-CR-387 (DLC) (S.D.N.Y. Jan. 28, 2022) (shooting was "in the heat of the moment" and not carefully planned over many years); <u>United States v. Jackson</u>, 351, F. Supp. 2d 108, 115 (factual record insufficient to show shooting was not in self-defense); <u>United States v. Knox</u>, Tr. of Sent., ECF No. 56, 21-CR-46 (GBD) (S.D.N.Y. Sept. 2, 2022) (same); <u>United States v. Williams</u>, Tr. of Sent., ECF No. 44 at 8, 20-CR-489 (JMF) (S.D.N.Y. Aug. 25, 2021) (no victims testified that defendant shot directly at them and one victim denied being shot at); <u>United States v. Tartt</u>, ECF No. 60 at 2, 20-CR-339 (LGS) (S.D.N.Y. Jan. 10, 2022) (defendant ceased shooting after missing); <u>United States v. Oquendo</u>, Tr. of Sent., ECF No. 682 at 6, 17-CR-611 (AT) (S.D.N.Y. Sept. 1, 2020) (finding that the plea agreement did not contain a provision allowing the government to argue that the attempted murder Guidelines should apply).

Here, the evidence overwhelmingly establishes that the defendant acted with the specific intent to commit first degree murder.

First, the defendant's intent to commit murder can be seen in the location he selected and the timing of the attack. Notably, the defendant committed his mass shooting on a crowded subway car during the morning rush hour which maximized the number of potential victims. Unlike shooting on a street or in a building where victims can run or hide, the subway car was entirely enclosed with no escape routes. Indeed, the defendant began shooting only once the subway car doors closed and the train was in between stations, leaving passengers with nowhere to find safety from the defendant's gunfire. Victims tried to pry open the doors of the subway car to no avail. The defendant's selection of the subway car created a "narrow field of fire," meaning there was less area for a bullet to cover before hitting a target. See Highlands Forensic Investigation & Consulting LLC Expert Report ("Forensic Report"), p. 12, filed separately under seal. Thus, by selecting to carry out the attack on a subway car during rush hour, the defendant intentionally increased the probability that he would kill passengers.

Second, the defendant's intent to commit murder can be seen in the way he carried out the attack to create a "kill funnel" to make shooting passengers easier and more effective. Before the defendant began shooting, he set off a smoke grenade which caused passengers to run to the opposite end of the train. The smoke grenade consolidated all the passengers on one end of the train, narrowing the defendant's field of fire and maximizing the chance that the defendant's bullets would hit passengers. Moreover, setting off the smoke grenade made it almost impossible for the defendant to aim to injure instead of aim to kill. Without seeing where he was shooting, the defendant could not possibly have calibrated his shots to only shoot people where it would cause "serious bodily injury" as opposed to death, as the defendant now argues. Had the defendant only wanted to cause "serious bodily injury," as he claims, he would not have set off the smoke grenade which prevented him from aiming to harm instead of aiming to kill. The fact that no one was killed by the defendant's 32 gunshots can only be described as luck as opposed to the defendant's intentional choice.

Third, the defendant's intent to commit murder can be seen in the type of gun, magazine, and ammunition that he used in the attack, each of which is specifically designed to maximize the harm caused by each gunshot. The defendant used a semi-automatic Glock 17 pistol which can fire multiple bullets in rapid succession. See id., p. 12. While each individual bullet fired requires an intentional trigger pull—and thus a separate decision to fire the gun each time—the Glock 17 is specifically designed to carry out rapid fire, making it uniquely designed to shoot more people in a short amount of time. See id.

The defendant also used a large capacity magazine with the Glock 17 pistol and had two additional large capacity magazines with him, one found on the floor and one in his backpack. Each large capacity magazine held 18 cartridges (unfired bullets), which is more than the standard number of cartridges a Glock 17 typically can hold. See id., pp. 5-6. The selection of a large capacity magazine enabled the defendant to fire more bullets without needing to stop and reload. See id. Indeed, the defendant only stopped shooting once his gun jammed. See id., pp. 10-12. The fact that the defendant possessed two additional large capacity magazines shows his intent to fire 36 additional shots on the subway car had his gun not jammed.

In addition, the defendant's choice to use Underwood 9mm +P+ caliber solid copper cartridges demonstrates his intent to kill. Unlike other bullets, the Underwood 9mm +P+ cartridges are specifically designed to "maximize each bullets['] damaging and/or wounding

potential." See id., p. 12. The Underwood website specifically highlights the uniqueness of the type of ammunition to cause maximum injury. Specifically, the website states that:

> [The ammunition] has an optimized nose flute, total weight, and velocity to achieve a penetration depth up to 18 inches* with a **permanent wound cavity (PWC) that is just simply enormous; no other expanding hollowpoint comes close to achieving anywhere near this diameter and volume**. Not only is the PWC over 100% larger than any other expanding bullet, expansion is achieved despite being shot through barriers. The solid copper body **ensures that wallboard, sheet metal, and automotive glass will have no effect on the Permanent Wound Channel**.[3]

The website states that the ammunition has a "permanent wound cavity (PWC) that is 2 times greater than any expanding bullet."

Thus, the gun, magazine, and ammunition that the defendant chose were specifically designed to cause death. Had the defendant simply wanted to seriously injure his victims, as he claims, he would not have chosen weapons designed to maximize the number of bullets fired and the amount of harm from each cartridge.

Fourth, the defendant's intent to commit murder can be seen in statements he made in his social media posts and YouTube videos which demonstrate a clear desire to kill people. The defendant's Facebook posts regularly included messages reflecting his intent to commit murder. In a Facebook post depicted below from April 2017—at which time the defendant was already planning his attack—the defendant included an image of a deceased individual with a "dead on arrival" ("DOA") tag tied to the individual's foot. The text on the image stated: "Call me what you want / Put on me any label you chose / But you better know this you worthless B***H / This is ONLY thing I'm trying to label you."



---

[3] https://underwoodammo.com/9mm-luger-p-90gr-xtreme-defender-solid-monolithic-self-defense-ammo-817-1/ (emphasis added).

In another Facebook post depicted below from February 2017, the defendant posted that "sticks and stones may break my bones and your words my[sic] even hurt me but you better know this you son of a b***h these 9mm bullets will kill you."



In posts from May 2021 and July 2021, the defendant posted the message: "have you ever wondered why you were alive? Well so have I and I can't think of one good reason your ass should be alive either."

Similarly, on February 17, March 12, and April 9, 2022—the latter of which was just three days before the subway shooting—the defendant repeatedly posted an image of a person laying dead on the ground with law enforcement cones identifying the location of fired bullets. The text on the image stated: "it's never to[sic] late to say f*** you."



In addition, in the weeks leading up to the attack, the defendant posted other messages indicating a desire to kill people. For example, on February 20, March 7, and March 11, 2022, the defendant posted that "they say the pen is mightier than the sword. I say the bullet is mightier than both [of] them."

In short, the defendant's Facebook posts over time and immediately before the shooting show a clear intent to kill—not seriously injure—people.

Videos that the defendant created and posted on YouTube also reflect his intent to kill people.  The defendant posted dozens of videos discussing his desire to forcibly reduce the population.  For example:

- In a video dated February 22, 2020 and titled "My Friend Mr. Molotov," the defendant stated that "there are too many humans on the planet who don't need to be here."

- In a video dated May 15, 2020 and titled "Comin to Get Ya," the defendant stated that "a factory reset should take place."  He went on to warn people to "watch your back. You better gear up.  Get a gun if you can get a gun.  You can't kill every motherfu**** but you can get two or three before they get you and yours. Start preparing."

- In a video dated October 25, 2021 and titled "A Blast from the Past," the defendant repeatedly stated that the "dying time . . . has to happen, for the possibly for change" and stated that the "dying time is here."

The defendant also posted numerous YouTube Videos praising murderers and expressing a desire to copy their actions.  For example, in an undated video titled "Ralph Mora Jail Video, the defendant stated that the individual known as the Bind Torture Kill ("BTK") Killer is one of his heroes, that Ted Bundy, another infamous mass murderer, is a close second, and that the defendant "wants to be like those motherfu****s that got away with that shit.'"[4]

Apparently conceding that these statements evidence the defendant's intent to commit murder, the defendant also tries to argue that while he initially planned to kill his victims, his "plans change[d]" and he decided "in the heat of the moment" on the train to only injure his victims.  See Def. Ltr., p. 4.  But his argument defies common sense, the evidence, and expert analysis.

The defendant's intent to commit murder throughout the entire attack can clearly be seen in the trajectory of his bullets.  As depicted in the image below, most of the bullets that the defendant fired—20 out of 32 bullets—were fired at seat height or higher, which would be expected to hit victims who were seated or standing.  See Forensic Report, pp. 13-14, 16.

---

[4] According to news articles, "Ralph Mora," the namesake of the defendant's video, was convicted of shooting someone to death and threatening to kill the victim's children if they testified against him.   See  https://www.latimes.com/archives/la-xpm-1987-12-05-me-6230-story.html.



Only three of the bullets the defendant fired hit the floor. See id., p. 14. Most of the bullets that the defendant fired went straight through the center of the train, making clear that the defendant was not aiming at the floor or at the ceiling of the car or away from the passengers. The defendant did the opposite: he aimed for center mass. He aimed to kill. Thus, the defendant's argument that he changed his mind right before committing the mass shooting is disingenuous.

The defendant's argument that he could not have intended to commit murder since his bullets—miraculously—did not hit anyone in the head or chest and no one died, see Def. Ltr., p. 4, also is negated by the evidence. First, the defendant's own purported expert, Marlyne K. Israelian, Ph.D., determined that the defendant's "visual-spatial-visual motor abilities" are low which, if credited, could explain why he failed to succeed in his "mission" to kill victims. See Expert Report of Marlyne K. Israelian, Ph.D. ("Israelian Report") ECF No. 81-3, p. 20. Second, while the defendant focuses on the fact that no one died from his gunfire, he ignores the fact that the medical evidence shows several victims required life-saving emergency surgery and could have died from their wounds had they not received such medical care.

In his sentencing submission, the defendant invokes the principle of Occam's razor: that the simplest explanation is usually the right one, implying that since no one died he must not have intended to kill them. See Def. Ltr., p. 4. But here, the simplest answer—based on the direction that the defendant fired the bullets, the fact that he did so in an enclosed space with no escape paths, and the dozens of posts he made about wanting to kill people—is that he intended to kill people. Fate just happened to be on the side of the victims that day.

Therefore, the government respectfully requests that the Court make the factual finding that the defendant intended to commit murder and use the attempted murder Guidelines provision to calculate the defendant's sentencing range. See U.S.S.G. § 2A2.1; PSR ¶ 67.

## B. A Two-Level Enhancement for Obstructing or Impeding the Administration of Justice Under U.S.S.G. § 3C1.1 Applies

The government and Probation also agree that a mandatory two-level enhancement under U.S.S.G. § 3C1.1 applies to the defendant's Guidelines calculation because he obstructed or impeded the administration of justice when, at his plea allocution, he falsely claimed that he did not intend to kill his victims and intended only to cause serious bodily injury. See PSR ¶ 63.

Under oath, the defendant told the Court that his "intention was to cause serious bodily injury to the people on the train" and it was "not [his] intention to cause death." However, as described above, the evidence overwhelmingly proves that the defendant intended to kill his victims. Thus, while the defendant's plea allocution was factually sufficient to meet the elements of the charges, his false denial of his intent to kill warrants application of the obstruction enhancement.

The Sentencing Guidelines provide for a two-level enhancement of a defendant's offense level if:

> (1) the defendant **willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice** with respect to the investigation, prosecution, or **sentencing of the instant offense of conviction**, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

See U.S.S.G. § 3C1.1 (emphasis added). The application notes set forth "examples of covered conduct" and specifically contemplate that the obstruction enhancement applies to a situation, like this, where the defendant provides "materially false information to a judge." See U.S.S.G. § 3C1.1, comment n.1(f).

"[T]o base a § 3C1.1 enhancement upon the giving of perjured testimony, a sentencing court must find that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." United States v. Pena, 751 F.3d 101, 105 (2d Cir. 2014) (internal citations omitted). According to the Second Circuit "[w]hile it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding, at a minimum, it must identify the statements on which the perjury was grounded, find that they are material, and make explicit findings that the defendant's testimony was intentionally false." See United States v. Hunt, 21-3020, at 22 (2d Cir. September 20, 2023) (internal citations omitted).

According to the Second Circuit, "the obstruction of justice enhancement under Section 3C1.1 is mandatory once its factual predicates have been established." United States v. Marigin, 66 F. App'x 266, 268–69 (2d Cir. 2003) (internal citations omitted) ("When Judge Hellerstein found that 'there was an attempt to obstruct or impede the administration of justice' and that the attempt was 'willful,' application of the two-level enhancement became mandatory."). Indeed, courts have applied the enhancement where defendants make false statements in their plea allocution. For example, in United States v. Sweeny, a defendant claimed

during his plea allocution that he never entered a bank during a robbery and only drove the getaway car. 797 F. Supp. 2d 233, 235 (E.D.N.Y. 2011) aff'd, 485 F. App'x 468 (2d Cir. 2012). In a <u>Fatico</u> hearing, however, the government established that the defendant entered the bank and demanded money from a teller. <u>Id.</u> The court found that the defendant's "false statements were material within the meaning of § 3C1.1 because, if believed, they would influence his sentence." <u>Id.</u> The court, therefore, applied the obstruction of justice enhancement. The application of that enhancement was subsequently affirmed by the Second Circuit. <u>Id.</u>

Here, the defendant's false claim that he intended only to cause serious bodily injury—not death—when he fired 32 shots onto a crowded subway was intended to minimize his culpability in the eyes of the Court at sentencing. The defendant, thus, willfully made a false statement to the Court in order to influence the Court to sentence the defendant to a lower term of imprisonment. The defendant's false statement is material to sentencing because the defendant's intent to kill as opposed to an intent to cause serious injury is a highly relevant factor under Section 3553(a) (as well as the appropriate Sentencing Guidelines calculation). Thus, the mandatory two-level enhancement for obstructing or impeding the administration of justice applies to the defendant's Guidelines calculation.

Accordingly, the government respectfully requests the Court make a factual finding that the defendant obstructed justice when, at his plea allocution, he stated that he did not intend to kill his victims, and find that his statement was material and intentionally false. <u>See</u> <u>Hunt</u>, No. 21-3020 at 22. The government also respectfully requests that the Court apply the two-level enhancement. <u>See</u> U.S.S.G. § 3C1.1; PSR ¶ 63.

## C. A Three-Level Reduction for Acceptance of Responsibility Under U.S.S.G. §§ 3E1.1(a) and (b) Does Not Apply

The government and Probation agree that the three-level reduction for acceptance of responsibility under U.S.S.G. §§ 3E1.1(a) and (b) does not apply because, at his plea allocution, the defendant falsely denied intending to kill his victims. <u>See</u> PSR ¶ 64. The application notes for U.S.S.G. § 3E1.1 explain that in determining whether a defendant qualifies for an acceptance of responsibility reduction, appropriate considerations include the following:

> 1.  (a) truthfully admitting the conduct comprising the offense(s) of conviction. . . . Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. **However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility**;
>     . . .

3. Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction will constitute significant evidence of acceptance of responsibility. . . . **A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right.**

U.S.S.G. § 3E1.1, comments 1(a), 3 (emphasis added).

As the Second Circuit has made clear, "[a] guilty plea does not, by itself, entitle a defendant to a reduced sentence under § 3E1.1.  The defendant must truthfully admit the conduct comprising the offense of conviction."  United States v. Reyes, 9 F.3d 275, 279 (2d Cir. 1993) (citations omitted).  In Reyes, the Second Circuit explained that while "a sentencing court may not compel testimony in respect of any offense other than the offense that is the subject of the plea . . . as to the offense that is the subject of the plea, the district court may require a candid and full unraveling, and need not accept lies or equivocation."  Id. (emphasis in original).  Where a defendant is not candid as to the offense that is the subject of the plea, "[t]he district court may deny a reduction under § 3E1.1 of the Guidelines based on a credibility determination that the defendant has not accepted responsibility for the offense of conviction."  Id. at 280.  "In determining whether the defendant has accepted responsibility for the full scope of the offense, the district court has discretion to weigh a defendant's candor and remorse."  Id.  "Whether or not a defendant has accepted responsibility for the offense of conviction is a factual question as to which the district court's determination should not be disturbed "unless it is 'without foundation.'"  Id.

In Reyes, for example, the defendant pleaded guilty to conspiracy to import cocaine.  In his plea allocution, the defendant admitted to diving under a boat to look for cocaine but claimed "that the sole objective of the diving expedition was to 'look underneath the boat to see if there was a container there'" and not to remove the cocaine.  Id. at 278.  The evidence, however, established that the defendant intended to remove the cocaine from the ship.  Id.  The district court determined that the acceptance of responsibility reduction was not appropriate, and the Second Circuit affirmed the ruling.  According to the Second Circuit, "[a]lthough [the defendant] accepted responsibility for conduct that satisfies the bare essentials of the offense of conviction, his explanation of his conduct was, in the eyes of the district judge, 'unbelievable.'"  Id. at 280.  Therefore, the Second Circuit affirmed the district court's finding that the defendant's lack of "candor in explaining the conduct comprising his offense of conviction" did not warrant an acceptance of responsibility reduction.  Id. at 281; see also United States v. Kumar, 617 F.3d 612, 636 (2d Cir. 2010) (affirming the district court's determination that the defendant's "carefully worded plea allocution . . . muted the gravity of his complicity in the securities fraud offenses."); United States v. Ward, 148 F. App'x 17, 18 (2d Cir. 2005) ("[T]he district court properly relied on [the defendant's] statements (throughout the proceedings) that expressed, at the very least, equivocation that hedged his culpability for one of the crimes underlying his conviction.").

The same is true here.  The defendant's claim, under penalty of perjury, that he did not intend to kill his victims and intended only to cause serious bodily injury is demonstrably false.  Therefore, the defendant is not entitled to the three-point reduction under U.S.S.G. §§ 3E1.1(a) and (b).

The cases cited by the defendant do not hold otherwise.  See Def. Ltr., p. 6.  For example, the defendant cited to United States v. Restrepo in which the Second Circuit stated that "though the relevant guideline commentary states that obstruction of justice 'ordinarily indicates that the defendant has not accepted responsibility,' it recognizes that this may not be so for 'extraordinary cases.'"  936 F.2d 661, 669 (2d Cir. 1991).  There, one of the defendants refused to provide a handwriting exemplar pursuant to subpoena which the court found constituted obstruction of justice within the meaning of U.S.S.G. § 3C1.1.  Id.  The court, however, exercised its discretion and applied the reduction for acceptance of responsibility anyway.  Based on the principle that "the sentencing judge is best situated to evaluate the defendant's acceptance of responsibility, and his determination will be set aside only if it is clearly erroneous," the Second Circuit upheld the sentence.  Id.  The case, however, affirms the principle that "ordinarily" a finding of obstruction negates the defendant's acceptance of responsibility.

The defendant also cited United States v. Johnson, 212 F. Supp. 2d 202 (S.D.N.Y. 2002), which is distinguishable.  There, the defendant initially pled guilty to a firearms offense and stated under oath at his plea allocution that he used a gun to commit a robbery.  Id. at 204.  After his plea, the defendant argued he was not actually committing a robbery when he brandished the gun.  Id. at 205.  The court held a Fatico hearing and determined that the defendant did use a gun during a robbery, but declined to withhold the acceptance of responsibility points because the defendant allocated truthfully and did not testify at the Fatico hearing so he never actually committed perjury.  Id. at 212.

Conversely, Frank James did commit perjury.  His mass shooting on the subway and his intentional refusal to take full responsibility for his attempted murder is not the type of case that warrants deviating from the well-established principle that when a defendant lies under oath to influence a sentence, he has not fully accepted responsibility for his crime.

Moreover, while the defendant claims that he has "at all times acknowledged his guilt of the underlying offense," "never sought a trial," and purportedly pled early to spare his victims from testifying and to save "government[] resources," that is simply not true.  See Def. Ltr., pp. 6, 14.  The defendant filed multiple pretrial motions, including to dismiss the charges against him, and did not change his plea to "guilty" until less than two months before trial.  In fact, in a recorded phone call on or about November 2, 2022, after the Court already set a February 2023 trial date, the defendant discussed his trial with a relative and stated that "the judge is talking about some February, but my lawyer says no way we gonna be ready by February, 'cause I got one terabyte worth of discovery to go through . . . It might not be till the after -- not next year, but the year after."  Given the defendant's posture, the government continued diligently to prepare for trial, including by meeting with victims who were forced to relive their trauma in preparation for potential testimony at trial.  And, even after pleading guilty, the defendant has refused to take accountability for his attempted murder of the innocent passengers on the subway.

The defendant's claim that he has never tried to "justify or minimize" his actions also is not true.  See Def. Ltr., p. 1.  As discussed more below, the defendant has tried to justify his crime by disingenuously claiming the shooting was to promote mental health awareness.  And he has tried to minimize his crime by claiming he only meant to hurt people not to kill them.  Both arguments cut against the defendant's claim that he accepted responsibility.

The government, thus, also respectfully requests the Court make a factual finding that the defendant failed to accept responsibility for his crimes and decline to apply the three-level reduction for acceptance of responsibility. See U.S.S.G. §§ 3E1.1(a) and (b); PSR ¶ 64.

IV.     The 18 U.S.C. 3553(a) Sentencing Factors

The defendant's attack, which was carefully planned over the course of several years, reflects the defendant's lack of regard for human life. The defendant's criminal conduct was premeditated, extremely dangerous, and warrants a serious sentence to punish the defendant and to protect the public, and to promote specific and general deterrence. The government has carefully considered the facts of this case and the full range of factors that the Court must consider at sentencing under 18 U.S.C. § 3553(a), and respectfully recommends that a concurrent sentence of life imprisonment on Counts One through Ten plus the mandatory consecutive sentence of 120 months' imprisonment on Count Eleven is sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case. See 18 U.S.C. § 3553(a). Indeed, the government respectfully submits that a sentence of life imprisonment is warranted under the Section 3553(a) factors even if the advisory Sentencing Guidelines did not call for such a sentence.

a.     The Nature and Circumstances of the Offense

The defendant's mass shooting altered the lives of countless people. Several million people ride the New York City subway every day. The passengers on the N train subway car on the morning of April 12, 2022, and the millions of New Yorkers who take the subway or have children or other loved ones who ride the subway to work or school were affected that day.

The defendant planned his attack, during morning rush hour, to maximize the terror he could cause and the attention he could receive for his violent actions. Knowing that his victims had nowhere to run, the defendant set off a smoke grenade when the train was between stations to push the passengers to one side of the train to make it easier to shoot them. The defendant then made the choice to pull the trigger 32 separate times despite passengers screaming out for help and in pain. Ten victims were shot, and several required life-saving emergency surgeries. Had the defendant's gun not jammed, the damage could have been even worse— the defendant had two additional fully loaded extended magazines with him.

The defendant's conduct was reprehensible. The defendant's victims suffered and continue to suffer ongoing physical and mental injuries because of the defendant's actions that day.[5] While some victims have addressed the Court by letter, many victims have expressed to the government that reliving the attack is still too painful for them to share even in a letter to the Court.

---

[5] The fact that no victims ultimately died from their life-threatening injuries does not entitle the defendant to leniency either. See, e.g., United States v. Abu Ali, 528 F.3d 210, 264, 269 (4th Cir. 2008) (reversing terrorism defendant's below-Guidelines sentence as unreasonable where the district court impermissibly emphasized "unrealized harm" to victims.).

Instead, they have asked the government to share their experiences with the Court.

For example, one of the victims was a high school student who was on his way to school when the defendant shot him twice. The victim's injuries required emergency surgery. The student had to take the rest of the school year off to recover from his injuries, and his mother had to take unpaid leave as a home health aide to care for him. Ultimately, the family had to move apartments before the next school year began so the student could walk to school because he was too traumatized to take the subway. Another victim was a recent immigrant who came to New York from a war-torn country for a safer life and economic opportunities. He was on his way to work as an electrician's assistant when the defendant shot him twice. Despite having little savings, the victim had to take a month off work unpaid to recover from his injuries and struggled to have enough food to eat. And, despite the victim's fear of the subway following the attack, he had to continue to ride the train to work once he resumed working because it was the only mode of transportation he could afford.

Other victims described the impact the defendant had on them. For example, one college student who was shot three times and required two surgeries and a stay in intensive care explained that "[e]very morning when I wake up, I have to remind myself that the shooter won't be able to hurt me today. If I don't tell myself that I simply can't get out of bed." See PSR ¶ 51. The victim, who was forced to withdraw from college because of his physical and mental injuries, also stated that he cannot ride the subway, has "nightmares of the shooter," and still has difficulty walking because of his injuries and surgeries. Id. Another victim—who has had serious complications due to gunshot wounds and required multiple surgeries over the course of 1.5 years—stated: "I look over my shoulder when walking in the street. I jump every time I hear a car backfire or fireworks go off. [The defendant] changed my life forever. I am not the same person I was a year ago. I will never be the same. I lost a very big part of me." See PSR ¶ 54.

While these are just some of the victims' stories, every subway passenger whom the government spoke with described the fears they faced at the thought of not seeing their children or loved ones again.

b. The History and Characteristics of the Defendant

As reflected in the PSR, the defendant reported to Probation that he had an "average" childhood with "no major trauma and no abuse or mistreatment in the household." See PSR ¶ 157. While the defendant's mother passed away when he was young, the defendant stated that his father was an "active, present parent." Id. The letters from his family members reflect a similar upbringing. See ECF No. 82. Notwithstanding the defendant's own characterization of his childhood to Probation and his family's letters about their upbringing, the defendant's sentencing submission claims for the first time that his father "beat him relentlessly, leaving formative and lasting memories." See Def. Ltr., p. 8.

As an adult, the defendant lived somewhat of a nomadic lifestyle with no close contacts. See PSR ¶ 159. The defendant reported a history of schizophrenia, and twice underwent in-patient psychiatric treatment, once in the 1990s and once in the 2010s. See PSR ¶ 165.[6]

In support of his appeal for leniency, the defendant hired two experts who determined, based on the defendant's self-reporting and a few hours of interviews, that he suffers from schizophrenia. See ECF Nos. 81-2 and 81-3. Dr. Bhushan Agharkar, a psychiatrist in private practice in Georgia who evaluated the defendant only for 3.8 hours over two days, determined that in his opinion the defendant suffered from "frontal and temporal lobe brain damage/disfunction" despite not requesting the defendant to undergo further testing. See Report of Dr. Bhushan Agharkar ("Agharkar Report") ECF No. 81-2, p. 8. The clinical psychologist, Dr. Israelian, who met with the defendant only twice and did not include how many hours she spent evaluating him, also concluded he had schizophrenia. See Israelian Report, p. 1.

Notwithstanding questions about the thoroughness of the defendant's mental health evaluations, the government does not dispute that the defendant has some level of mental health issues and supports the defendant receiving all available mental health treatment in custody.[7]

Nevertheless, the defendant's mental health issues do not warrant a lesser sentence as the defendant argues. See Def. Ltr., pp. 8-12. The defendant's attempt to characterize his attack as a psychiatric break caused by a "snap" and "hallucinations" is plainly unsupported by the record. Notably, the defense submission and expert reports imply that the defendant's schizophrenia resulted in "paranoid delusions" which caused him to commit the subway shooting without fully understanding or intending his actions. See Def. Ltr., p. 1 (implying that his "paranoid schizophrenia" caused him to "snap"); Israelian Report at 27. The defense submission also misleadingly implies that the defendant recently went off medicine for schizophrenia, which caused the attack. See Def. Ltr, p. 1.

But none of that is true. The defendant stopped taking medication to treat schizophrenia years earlier because he "did not like taking them." See Agharkar Report, p. 4. The defendant also never claimed that he was hallucinating or hearing voices on the day of the attack which caused him to shoot up a subway car. Rather, the dozens of social media posts that the defendant created before the shooting show that he carefully planned and thought through the attack for years. Moreover, at his plea allocution, the defendant acknowledged that he committed the shooting fully understanding what he was doing. See Plea Tr. ("I was fully aware of the fact that a death or deaths could occur as a result of [his] discharging a firearm in such an enclosed

---

[6] While the government would ordinarily seek the Court's permission to seal information related to a defendant's mental health in order to protect an individual's right to privacy, the defense opted to publicly file the defendant's psychological evaluations.

[7] While the defense submission argues that the defendant should receive leniency because the Bureau of Prisons ("BOP") lacks resources to treat mental illness, see Def. Ltr, pp. 10, 12, the defendant's own expert noted that the defendant is the one who has "declined to participate in mental health visits" since being incarcerated. Agharkar Report, p. 4.

space in the subway car" yet he chose to pull the trigger 32 times until his gun jammed anyway.")

In addition, the defendant's claim—for the very first time—that he committed the mass shooting to "expose the failings of the mental health system" and so others could "access help," <u>see</u> Def. Ltr., p.1; Agharkar Report, p. 4, is contradicted by his own pre-attack statements. As detailed above, the defendant was a prolific social medial poster who wrote often of his desire to commit murder. His posts included statements that he wanted to commit murder "for retaliat[ion] and revenge," because "there are too many humans on the planet who don't need to be here," and to be like his "hero" Ted Bundy—<u>not</u> to bring light to the mental health crisis. Indeed, in a video the defendant created three months before the shooting, in which he foreshadowed the subway attack, the defendant told his followers to "download my videos while you can because they're probably going to delete my channel." Yet the defendant's videos did not mention committing a mass shooting to shed light on mental health access. Instead, he posted messages such as "have you ever wondered why you were alive? Well so have I and I can't think of one good reason your ass should be alive either," a far cry from trying to improve access to mental health care.

There is no evidence that the defendant committed this attack to raise awareness about mental health. Nor does the defense even articulate how planning and executing a mass shooting could possibly raise positive awareness about any failings of the mental health system. The Court should not credit this purported motive. But, in any event, the defendant's mental health issues do not mitigate his proven dangerousness or undercut the need protect the community from his future dangerousness or punish him for his actions.

c. The Purpose of Sentencing

The government respectfully submits that a sentence of life plus the mandatory 120 months' imprisonment is necessary to reflect the seriousness of the defendant's offense, to promote respect for the law, and to provide just punishment. <u>See</u> 18 U.S.C. § 3553(a)(2)(A). As discussed above, the defendant targeted innocent people. Miraculously, no one died from the defendant's actions. But the mental and physical impact on the victims continues to this day. To adequately punish the defendant's senseless violence that changed the course of dozens of people's lives, a serious punishment is necessary.

The government's recommended sentence also is necessary for specific and general deterrence. <u>See</u> 18 U.S.C. § 3553(a)(2)(B). With respect to specific deterrence, the defendant remains a threat to the community. The defendant's own online posts demonstrate his deep commitment to violence and destruction. Sentencing the defendant to life in prison is the only sentence that will ensure he never harms the public again. While the defendant argues that the 18-year sentence he requests would, practically speaking, ensure he spends the rest of his life in prison, <u>see</u> Def. Ltr., p. 14, that is not necessarily the case. Based on BOP guidelines and current law, the defendant likely would serve less than the full sentence imposed by the Court. Any sentence that leaves open the possibility of the defendant being released from jail is insufficient to protect the community from his violence. This is especially true where, as here, the defendant posted videos stating that due to his advanced age he had nothing to lose.

The defense submission also misleadingly implies that Dr. Israelian found that the defendant "may not pose a threat to himself or others." <u>See</u> Def. Ltr., p. 14. But Dr. Israelian's full statement was that "[i]ncarcerated, Mr. James may not pose a threat to himself or others" because he will be in jail. <u>See</u> Israelian Report, p. 14. Moreover, it is paradoxical for the defendant to argue that (1) he committed the mass shooting because of mental health issues and (2) the BOP is incapable of treating his mental health issues, but still claim that somehow, since his mass shooting, the defendant ceased being a risk of violence. <u>See</u> Def. Ltr., p. 14. The defendant has already proven he remains a danger. The sentence imposed should ensure he does not have the opportunity to hurt anyone again.

The recommended sentence also promotes general deterrence, in that a life sentence will deter others who may contemplate similar attacks from carrying them out. A sentence of life imprisonment is necessary to show the public that those who put countless lives in danger will be held accountable.

\*      \*      \*

In short, when the defendant fired dozens of rounds on a crowded subway during morning rush hour, he changed the lives of his victims and the citizens of this city. The sentence handed down by this Court should ensure that the defendant can never harm others again.

V.     <u>Restitution</u>

According to 18 U.S.C. § 3663A, restitution in this case is mandatory. As of the date of this letter, two victims have requested restitution in the amount of $3,150 to victim F.H. and $3,123.66 to victim A.L. <u>See</u> PSR ¶¶ 197. The government requests that the Court order the defendant to pay restitution to both victims in the amounts sought. The government also respectfully requests leave to file a supplemental restitution request should additional victims submit loss affidavits within 60 days of the sentencing hearing.

VI.     Conclusion

For the reasons stated above, the government respectfully requests that the Court adopt the PSR in its entirety and make the factual findings that the defendant: (1) intended to commit murder; (2) obstructed justice when, at his plea allocation, he stated that he did not intend to kill his victims, and find that his statement was material and intentionally false; and (3) did not accept responsibility for his crimes.

The government also respectfully requests that the Court sentence the defendant to ten concurrent sentences of life imprisonment on Counts One through Ten and a mandatory consecutive sentence of 120 months' imprisonment on Count Eleven, and order restitution as set forth above.

Respectfully submitted,

BREON PEACE
United States Attorney
Eastern District of New York

By:     _____/s/_____
        Sara K. Winik
        Ellen H. Sise
        Assistant U.S. Attorneys
        (718) 254-7000

cc:     Clerk of Court (WFK) (by ECF)
        Defense counsel (by ECF)
        Roberta Houlton, Senior United States Probation Officer (by Email)