UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
UNITED STATES OF AMERICA,           :
            :
       v.         :      **ORDER**
            :      22-CR-214 (WFK)
            :
FRANK JAMES,            :
            :
      Defendant.      :
------------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

On January 3, 2023, Defendant Frank James ("Defendant") pled guilty to each count of an eleven-count Superseding Indictment. Counts One through Ten of the Superseding Indictment each charge Defendant with committing a Terrorist Attack and Other Violence Against a Mass Transportation System and Vehicle Carrying Passengers and Employees, in violation of 18 U.S.C. §§ 1992(a)(7), 1992(a)(10), 1992(b)(l), 1992(c)(1), 1992(c)(2) and 3551 *et seq*., and Count Eleven charges him with Discharging a Firearm During a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(A)(ii), 924(c)(1)(A)(iii) and 3551 *et seq*. *See* ECF No. 56. The Court now sentences Defendant and provides a complete statement of reasons pursuant to 18 U.S.C. § 3553(c)(2) of those factors set forth by Congress in 18 U.S.C. § 3553(a). For the reasons set forth below, Defendant is hereby sentenced to a term of imprisonment of life on Count One; a term of imprisonment of life on Count Two; a term of imprisonment of life on Count Three; a term of imprisonment of life on Count Four; a term of imprisonment of life on Count Five; a term of imprisonment of life on Count Six; a term of imprisonment of life on Count Seven; a term of imprisonment of life on Count Eight; a term of imprisonment of life on Count Nine; a term of imprisonment of life on Count Ten; and a term of imprisonment of life on Count Eleven. The Court also imposes a mandatory special assessment of $1,100.00; given the Defendant's inability to pay a fine, no fine; and restitution in the amount of $6,273.66. The Court declines to impose a term of supervised release at this time but will allow an application for a term of supervised release to be imposed at a future date should such application be appropriate.

## BACKGROUND

On December 16, 2022, the Government filed an eleven-count Superseding Indictment charging the defendant, Mr. Frank James ("Defendant"), with ten counts of committing a Terrorist Attack and Other Violence Against a Mass Transportation System and Vehicle Carrying Passengers and Employees, in violation of 18 U.S.C. §§ 1992(a)(7), 1992(a)(10), 1992(b)(l), 1992(c)(1), 1992(c)(2) and 3551 *et seq*., and one count of Discharging a Firearm

During a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(A)(ii), 924(c)(1)(A)(iii) and 3551 *et seq.*  The Superseding Indictment also contains criminal forfeiture allegations with respect to all counts.

On January 3, 2023, Defendant pled guilty to each of the eleven counts of the Superseding Indictment.

The Court now sentences Defendant and sets forth its reasons for Defendant's sentence using the rubric of the 18 U.S.C. § 3553(a) factors pursuant to 18 U.S.C. § 3553(c)(2).

## DISCUSSION

I.    **Legal Standard**

18 U.S.C. § 3553 outlines the procedures for imposing sentence in a criminal case.  In addition to the seven factors listed in 18 U.S.C. § 3553(a), a sentencing court must consider the Sentencing Guidelines ("Guidelines").  However, the Guidelines are merely advisory in light of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 264 (2005).

Nevertheless, the sentencing range recommended by the Sentencing Guidelines is the "starting point and the initial benchmark" in evaluating a criminal sentence.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  If a district court chooses to impose a sentence outside of the Guidelines range, the court "shall state in open court the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines.  18 U.S.C. § 3553(c)(2).  The court must also "state[] with specificity" its reasons for so departing or varying "in a statement of reasons form."  *Id.*  "The sentencing court's written statement of reasons shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under §

3553(a)."  *United States v. Davis*, 08-CR-0332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.).

 This Court has considered the applicable Guidelines range as well as the seven factors listed in Section 3553(a).  *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005).  It now addresses each in turn.

## II.    Analysis

### A.  The History and Characteristics of the Defendant and the Nature and Circumstances of the Offense

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).

1.   Nature and Circumstances of the Offense

The New York City Police Department ("NYPD") and the Federal Bureau of Investigation ("FBI") led the investigation into the instant offense.  Presentence Investigation Report ("PSR"), ECF No. 76, ¶ 16.

 On the morning of April 12, 2022, Defendant boarded a crowded N train subway car in Brooklyn, New York.  *Id.* ¶ 17.  He had disguised himself to look like  a construction worker or Metropolitan Transportation Authority ("MTA") employee, dressed in a yellow hard hat and orange reflective jacket.  *Id.* ¶ 17, 18.  Once on the train, Defendant lured passengers to one end of the subway car by telling anyone who tried to sit near him the seats were wet.  *Id.* ¶ 18.  After successfully concentrating the passengers together, Defendant set off a smoke grenade, filling the train with heavy smoke and causing panic to ensue.  *Id.*  At approximately 8:26 A.M., with the passengers effectively trapped in the far section of the subway car, Defendant opened fire upon them with a semi-automatic Glock 17 pistol.  *Id.* ¶ 19.

3

As the train was traveling between stations at the time and then temporarily stalled, the passengers had no means of escape. *Id.* Furthermore, because Defendant used a semi-automatic firearm with an extended magazine, Defendant was able to fire bullets in rapid succession without having to pause to reload. *Id.* Defendant aimed his bullets at seat height or higher, thus targeting where passengers would be expected to sit or stand. *Id.* ¶ 20. Although Defendant stopped firing when his gun jammed, he had also brought with him two additional, fully-loaded extended magazines with the combined capacity to fire a total of 72 additional bullets. *Id.* ¶ 19.

Once the train reached the next station, 36th Street in Sunset Park, Brooklyn, passengers fled from the subway car onto the platform, screaming for help and running for safety. *Id.* ¶ 22. In an effort to avoid detection, Defendant shed his apparent construction disguise and abandoned his Glock 17 and an axe in the subway car. *Id.* ¶¶ 24, 29. Defendant then boarded an R train, which was waiting across the platform, and fled the scene. *Id.* ¶ 24. He emerged from the 25th Street subway station approximately fifteen minutes after the shooting. *Id.* Defendant spent the rest of the day roaming New York City, riding public transportation and changing his clothing frequently in an effort to evade law enforcement. *Id.* ¶ 25.

In a matter of minutes, Defendant managed to fire his gun 32 times. *Id*. ¶¶ 19-20. He successfully struck 10 victims before his weapon jammed and the passengers were able to escape. *Id*. Fortunately, no one was killed during Defendant's attack. *Id*. ¶¶ 47-59. However, each of his 10 gunshot victims were grievously injured. *Id.* Other passengers who the Defendant failed to hit directly suffered serious injuries, as well, including injuries from smoke inhalation. *Id.* ¶ 57.

Defendant chose to perpetrate his violent attack during the morning rush hour, at a time when the subway car was characteristically crowded with people. *Id.* ¶ 21. Passengers on the

4

train that day included children, pregnant women, college students, and others on their way to work and school. *Id.* One passenger who was trapped on the train recorded a video, depicting the horrific scene, which included passengers screaming for help, nearly blinded by smoke, and bleeding heavily from the injuries they sustained in the attack. *Id.*

The evidence law enforcement recovered during their subsequent investigation revealed Defendant carefully and methodically planned his attack. *Id.* ¶¶ 30-46. Defendant rented a U-Haul van in Philadelphia, Pennsylvania the day prior to the shooting, which he drove to Brooklyn in the early morning hours of April 12, 2022. *Id.* ¶ 31. A search of Defendant's storage unit in Philadelphia revealed various items tying Defendant to the mass shooting, including: a pistol barrel, targets, and ammunition used with an AR-15 semi-automatic rifle. *Id.* ¶ 32. Moreover, investigators searched Defendant's short-term rental apartment in Philadelphia also finding an empty magazine for a Glock handgun, a taser, a high-capacity rifle magazine, and a blue smoke cannister, among other items. *Id.* Law enforcement officers also recovered a stockpile of weapons and ammunition from other locations controlled by Defendant. *Id.* ¶ 33.

The instant investigation revealed Defendant spent years preparing for his deadly attack. *Id.* ¶ 34. According to Defendant's payment records, he purchased Enola Gaye EG18X smoke grenades on January 8, 2017 and June 29, 2019—the same brand of smoke grenade Defendant used in the subway attack. *Id.* Additionally, according to records from a firearms supply company, on October 23, 2019, Defendant purchased multiple boxes of Underwood Xtreme Defender 9mm Luger +90 Grain ammunition—again, the very same brand of ammunition he would later use in the attack. *Id.* Payment records also reveal, on May 17, 2021, Defendant purchased the KwikSafety yellow hard hat matching the one he wore as a disguise during his attack. *Id.*

5

Surveillance video and cell site data also show Defendant took multiple trips to New York in the months preceding the attack to do "practice runs" to prepare for the attack. *Id.* ¶ 35. For example, on March 31, 2022, Defendant spent nearly an entire day riding various subway lines, including the N train in Brooklyn, the same line on which he ultimately perpetrated the attack. *Id.* This data also reveals Defendant conducted similar "practice runs" on April 1, 2022, and April 9, 2022. *Id.*

Defendant's Google search history provides further evidence of the premeditated and thought out nature of his attack. *Id.* ¶ 36. On March 19, 2022, Defendant searched the phrases "gun shops near Columbus Ohio" and "can I buy a gun in Ohio if I'm not a resident." *Id.* On March 21, 2022, Defendant searched for the name of the storage facility he visited the day before the attack. *Id.* On April 1, 2022, Defendant searched for "MTA," "New York," "transit," and "stops on the N train." *Id.* Finally, on April 6, 2022, Defendant searched for "311 kings highway Brooklyn ny," an address close to the location he selected to park his U-Haul van before entering the N street subway station on April 12, 2022. *Id.*

The deliberate nature of Defendant's attack is also reflected in videos he created and saved on his phone and posted on YouTube under various pseudonyms. *Id.* ¶ 37. Defendant posted a video on August 5, 2019, discussing traveling to New York. He stated, "at the very least it's going to be very interesting. Let me say that. It's going to be very interesting what happens in New York with me." *Id.* ¶ 38. In other videos, Defendant stated the "whole system is coming down," referring to the September 11, 2001 terrorist attack on the World Trade Center, and added his view the victims of those attacks were "better off dead." *Id.*

Defendant repeatedly discussed his belief the human population needed to be reduced. *Id.* ¶ 40. In a video dated February 22, 2020, titled "My Friend Mr. Molotov," Defendant stated

6

"there are too many humans on the planet who don't need to be here." *Id.* ¶ 40.  On May 15, 2020, in a video titled "Comin to Get Ya," Defendant proclaimed "a factory reset should take place" and warned his audience to "watch your back. You better gear up. Get a gun if you can get a gun. You can't kill every motherfucker but you can get two or three before they get you and yours. Start preparing." *Id.*

Defendant posted numerous YouTube Videos in which he praised notorious murderers including Ted Bundy and expressed a desire to follow in their footsteps. *Id.* ¶ 41.  Defendant also regularly posted on Facebook describing his yearning to commit murder. *Id.* ¶¶ 43-46. Defendant also made a variety of disturbing statements in an audio file saved on his phone in January 2022, including "[i]f you hear the name Frank James on the news, if something happens to a Frank James that's sixty-something years old, chances are that's me." *Id.* ¶ 39.

### 2.   Family and Personal Background

Defendant was born on August 8, 1959 in the Bronx, New York to the marital union of Charles Clark and Mary James. *Id.* ¶ 155.  Defendant grew up one of six children, however, two of Defendant's five siblings are now deceased, as are both his parents. *Id.* ¶ 156.  Defendant's surviving siblings are aware of his conviction.  Indeed, several of Defendant's family members have submitted letters to the Court in which they describe the Frank James they grew up with, the hardships he has faced, and their ongoing support for him. *See generally* Def. Supp. Mem., ECF No. 82.  The Court has reviewed carefully each of these submissions and respectfully acknowledges the Defendant's family members' ongoing support of their relative.

Defendant was raised by his father in a low-income household in South Bronx, New York. *Id.* ¶ 157.  Defendant reported having an "okay" relationship with his father, whom he described as being an active and present parent. *Id.*  Although Defendant did not inform

Probation he experienced abuse as a child, defense counsel maintains Defendant's father "beat [Defendant] relentlessly, leaving formative and lasting memories, and leaving [Defendant] terribly afraid." Def. Mem., ECF No. 81, at 8. Defendant reported amicable childhood relationships with his sisters, though he and his siblings lost touch as adults. PSR ¶ 157. Overall, Defendant reported his childhood was average and free from major trauma, abuse, or mistreatment. *Id.* However, Defendant also reported the neighborhood in which he grew up was impoverished, dangerous, and blighted by drug activity and violence. *Id.* Defendant recalled he frequently witnessed fights and arguments in his neighborhood as a youth. *Id.*

Defendant left his family home in his twenties and lived on his own in the Bronx, followed by several cities, including Livingston, Elizabeth, and East Orange, New Jersey; Philadelphia, Pennsylvania; Wilmington, Delaware; Miami, Florida; Columbus, Ohio; Chicago, Illinois; and Milwaukee, Wisconsin. *Id.* ¶ 159. Defendant's last known residence was a rental apartment in Milwaukee. *Id.* Prior to his arrest for the instant offense, Defendant had no fixed address and his last known location was a short-term rental located in Philadelphia.

Defendant has never married and has no children. *Id.* ¶ 158.

3. Educational and Employment History

Defendant received his General Educational Development diploma from Argus Community High School in 1979. *Id.* ¶ 172.

From 1983 until the early 1990s, Defendant was employed as a machinist in New York and New Jersey. *Id.* ¶ 178. From 1985 until 1987, Defendant was enlisted in the Army National Guard. *Id.* ¶ 180. Defendant received an honorable discharge, with a final rank of Private First Class. *Id.* Between 1999 and 2006, Defendant was employed as a maintenance service manager

at a residential psychiatric facility.  *Id.* ¶ 177.  Defendant was laid off from this position after

being injured in a workplace accident and was unable to continue working.  *Id.*

Since 2010, Defendant has been classified as disabled and received monthly Social

Security Disability Insurance ("SSDI") benefits of approximately $1,690.00 per month.  While

SSDI benefits have been Defendant's primary source of income, he has also worked part-time

and short term jobs.  *Id.* ¶ 174.  Between 2012 and 2019, Defendant was intermittently

employed as a temporary worker at various locations across Illinois, Ohio, and Wisconsin,

including as a driver and food service worker.  *Id.* ¶ 176.  For approximately eight or nine

months in 2020, Defendant was employed at an Amazon Fulfillment Center as a warehouse

worker in Oak Creek, Wisconsin.  *Id.* ¶ 175.  That same year, Defendant was also employed as a

grocery delivery driver in Milwaukee, Wisconsin.  *Id.*

### 4.  Prior Convictions

Defendant has an extensive history with the criminal justice system.  *Id.* ¶¶ 136-148.

Defendant was arrested for the first time at the age of 21 on August 27, 1980, when he was

charged and subsequently convicted of Reckless Endangerment in the 2nd Degree.  *Id.* ¶ 136.

On December 20, 1991, Defendant was again arrested and subsequently charged for trespassing.

*Id.* ¶ 137.  On August 10, 1992, Defendant was arrested and subsequently convicted yet again,

this time for Larceny.  *Id.* ¶ 138.  On September 2, 1992, Defendant was arrested and

subsequently convicted of Attempted Petit Larceny.  *Id.* ¶ 139.

Defendant was arrested and subsequently convicted for Criminal Tampering in the 2nd

Degree five times between 1992 and 1998, including on November 29, 1992, January 25, 1993,

June 7, 1993, February 21, 1994, and December 11, 1998.  *Id.* ¶¶ 140, 141, 143, 145, 147.  Each

time, Defendant used tools to remove U.S. currency from public telephones.  *Id.*

Defendant was also arrested and subsequently convicted twice for Intent to Obtain Transportation Without Paying, including on February 4, 1993, and August 5, 1993, after Defendant was observed manipulating turnstiles to enter subway stations without paying. *Id.* ¶¶ 142, 144.

On September 11, 1996, Defendant was arrested and subsequently convicted of Harassment for threatening an unspecified act with the purpose of terrorizing employees of Curtiss Wright Flight Systems and for threatening to murder with the purpose of terrorizing an individual. *Id.* ¶ 146.

Finally, on December 8, 2007, Defendant was arrested and subsequently convicted for Disorderly Conduct: Improper Behavior. *Id.* ¶ 148. Specifically, Defendant was alleged to have used offensive, abusive, and threatening language and hand movements and gestures as he refused to comply with a lawful order. *Id.*

### 5. Medical and Mental Health

Defendant has been classified as disabled since 2010 as a result of his mental health issues, which include depression and schizoaffective disorder. *Id.* ¶ 165. Defendant reported his first encounter with the mental health system occurred in 1975, when his high school counselor referred him for treatment and medication. *Id.*

Defendant's mental health struggles followed him into adulthood. In 1980, Defendant attempted to commit suicide while in custody at Rikers Island Correctional Facility. *Id.* ¶ 166. During the mid-1990s, Defendant was a patient at the Bridgeway House, a psychiatric supportive living program in Elizabeth, New Jersey, where he later secured employment. *Id.* ¶ 165. In 2010, while living in Miami, Florida, Defendant participated in an inpatient program, after which he was prescribed medication and referred to outpatient treatment. *Id.* ¶ 167. Defendant

10

continued to seek mental health treatment following this program, including while he was living in Columbus and Chicago. *Id.*

Defendant reported he has not received mental health treatment during his instant incarceration and is not currently prescribed medication, although he has received periodic visits from a counselor to assess his current mental health status. *Id.* ¶ 168. According to Defendant's medical records from the Metropolitan Detention Center ("MDC"), Defendant was initially placed on suicide watch and Defendant reported his mind has been "foggy" ever since his arrest for the instant offense. *Id.* Defendant was also diagnosed with Unspecified Schizophrenia and Other Psychotic Disorder. *Id.*

6. Substance Abuse

Defendant began experimenting with marijuana and cocaine between the ages of 15 and 18, although he has since stopped using them. *Id.* ¶ 169. Defendant participated in a substance abuse treatment in a program in the 1990s. *Id.* ¶ 171. However, Defendant has never again sought drug abuse treatment and reported he does not believe additional treatment is necessary. *Id.*

Defendant has struggled with alcohol abuse from an early age. Defendant began drinking alcohol regularly at the age of 13 and began consuming alcohol heavily in 2007, following the loss of his job. *Id.* ¶ 170. Defendant reported he has gone through cycles of heavy drinking followed by brief periods of abstention throughout his life. *Id.* Defendant reported, during his periods of heavy drinking, including up until his arrest for the instant offense, he consumed a fifth (750 ml bottle) of vodka or whiskey daily. *Id.* Defendant described himself as a "functional alcoholic" and claimed his alcohol consumption did not cause major problems in his

life.  *Id.*  However, Defendant acknowledged he was socially isolated and lacked close relationships.  *Id.*

### B.  The Need for the Sentence Imposed

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2).

The instant sentence reflects the severity and the magnitude of Defendant's crimes.  As is demonstrated in the impact statements submitted by Defendant's victims, all of which this Court has reviewed very carefully, Defendant forever altered the course of many lives on April 12, 2022.  Defendant's victims make painfully clear the devastating and enduring impact Defendant's actions have had on their lives.  *Id.* ¶¶ 47-60.  At the time of the attack, Defendant's ten gunshot victims were between the ages of 16 and 60.  *Id.*  Each was at a different point of their lives—on their way to work, high school, or a college class.  *Id.*  Yet, tragically, each was brought into Defendant's path simply because they happened to board the wrong train at the wrong time.  *Id.*

Many of Defendant's victims report suffering permanent scarring and disabilities as a result of the injuries he inflicted upon them, and many have had to undergo extensive, painful surgeries and recovery processes.  *Id.*  Beyond physical injury, Defendant has caused devastating emotional and psychological harm to his victims, many of whom now struggle with post-traumatic stress disorder, depression, social withdrawal, and nightmares.  *Id.*  As one victim

12

described, if only she had missed the train that morning, she "would not be suffering then, now and what seems like the rest of [her] life, physically and mentally." *Id.* ¶ 54.

The Court also recognizes Defendant's violent attack has impacted far more lives than those he injured directly. Defendant robbed a sense of safety and security from the individuals in the subway car and on the platform on April 12, 2022, and from the millions of people who use the New York subway system every day.

This Court acknowledges Defendant's long-term struggles with addiction and mental health. However, this Court also notes the methodical and calculated nature of this crime—which, as the subsequent investigation revealed, Defendant planned for years. Defendant purchased and stockpiled weapons, disseminated violent messages on social platforms previewing his eventual crime, and even completed practice runs in anticipation of the mass shooting. The Defendant's actions were carefully and meticulously planned to inflict maximum carnage.

The instant sentence reflects the seriousness of the Defendant's offense, justly punishes him for this offense, and seeks to deter others from engaging in similar acts. In particular, the Court's sentence specifically seeks to deter this Defendant from committing future crimes.

**C. The Kinds of Sentences Available**

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3).

Defendant pled guilty to an eleven-count Superseding Indictment charging ten counts of committing a Terrorist Attack and Other Violence Against a Mass Transportation System and Vehicle Carrying Passengers and Employees, in violation of 18 U.S.C. §§ 1992(a)(7), 1992(a)(10), 1992(b)(l), 1992(c)(1), 1992(c)(2) and 3551 *et seq.*, and one count of Discharging a Firearm

During a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(A)(ii), 924(c)(1)(A)(iii) and 3551 *et seq*.

For Counts One through Ten, Defendant faces a statutory maximum term of imprisonment of life and no minimum term. 18 U.S.C. §§ 1992(a)(7) and 1992(b)(1). For Count Eleven, Defendant faces a statutory maximum term of imprisonment of life and a minimum term of imprisonment of ten (10) years to follow any punishment on Counts One through Ten. 18 U.S.C. § 924(c)(1)(A)(iii). For Counts One through Ten, Defendant faces a maximum term of supervised release of five (5) years and no minimum term. 18 U.S.C. § 3583(b)(l). For Count Eleven, Defendant similarly faces a maximum term of supervised release of five (5) years and no minimum term. 18 U.S.C. § 3583(b)(l). Defendant is ineligible for probation on Counts One through Eleven. 18 U.S.C. §§ 3561(a)(3) and 924(c)(l)(A)(i).

Defendant also faces a fine of not more than two hundred and fifty thousand dollars ($250,000.00) on all Counts. 18 U.S.C. § 3571(b). The Court is also required to impose restitution in an amount to be determined by the Court pursuant to 18 U.S.C. §§ 3663A and 3664, as well as a mandatory special assessment of $100.00 per count, which the Court is required to impose in all cases pursuant to 18 U.S.C. § 3013.

**D.  The Kinds of Sentence and the Sentencing Range Established for Defendant's Offense**

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]"  *Id.* § 3553(a)(4)(A).

**i.    Guidelines Calculation**

Probation calculates Defendant has a total combined adjusted offense level of 43, PSR ¶ 134, and a total criminal history score of 0, *id.* ¶ 149, resulting in a criminal history category of I, *id.* ¶ 150.  Counts One through Ten each charge committing a Terrorist Attack and Other Violence against a Mass Transportation System and Vehicle Carrying Passengers and Employees.  *Id.* at ¶¶ 66-126.  These Counts cannot be grouped pursuant to Guidelines section 3D1.2, because each of Counts One through Ten involve a different victim and a different harm. Count Eleven is excluded from the application of the multiple-count rules pursuant to Guidelines section D1.1(b)(1).

Prior to discussing Probation's Guidelines calculation with respect to each of the Eleven counts charged against Defendant, the Court deems it appropriate to address the application of the obstruction of justice enhancement.  Guidelines section 3C1.1 calls for the application of an obstruction enhancement if the sentencing court finds a defendant perjured himself while testifying before the court.  Specifically, a section 3C1.1 enhancement is warranted if the "sentencing court ... find[s] that the defendant (1) willfully (2) and materially (3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." *United States v. Zagari*, 111 F.3d 307, 329 (2d Cir. 1997); *see also United States v. Pena*, 751 F.3d 101, 105 (2d Cir. 2014) (internal citations omitted).  At a minimum, this Court must

"identify the statements on which the perjury finding was grounded," find these statements are material, and "make explicit findings that [the] defendant's testimony was intentionally false." *United States v. Rosario*, 988 F.3d 630, 634 (2d Cir. 2021). "The facts necessary to support an obstruction-of-justice enhancement need be proven only by a preponderance of the evidence." *United States v. Khedr*, 343 F.3d 96, 102 (2d Cir. 2003); *United States v. Sanchez*, 679 F. App'x 81, 83 (2d Cir. 2017). A defendant's statement regarding his intent is material to the extent his intent is an element of the offense. *United States v. Hunt*, No. 21-3020, 2023 WL 6133211, at *10 (2d Cir. Sept. 20, 2023).

Probation and the Government argue the Court should apply the obstruction enhancement against this Defendant based upon allegedly false claims he made during his plea allocution, namely that he did not intend to kill his victims and intended only to cause serious bodily injury. Having carefully considered the parties' arguments discussed *infra* as well as the evidence they reference, the Court finds Defendant's claims regarding his criminal intent were false. The Court further finds Defendant intentionally made these false statements regarding his criminal intent in an effort to receive a lesser sentence. Finally, the Court determines Defendant's statements were material because they pertained to an element of the offense. Accordingly, the Court finds Defendant has obstructed or impeded the administration of justice, and consistent with this finding, a two-level enhancement to Counts One through Ten is warranted pursuant to Guidelines section 3C1.1.

### 1. Total Adjusted Offense Level

#### a. Count One

Count One charges Defendant with committing a Terrorist Attack and Other Violence against a Mass Transportation System and Vehicle Carrying Passengers and Employees,

specifically with respect to victim K.A.  The applicable guideline for Count One is Guidelines section 2A2.1, and the base level is 33, per Guidelines section 2A2.1, because the object of the offense would have constituted first degree murder.  *Id.* ¶ 67.  Two levels are added pursuant to Guidelines section 3C1.1 because Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to Defendant's offense of conviction and any relevant conduct; or a closely related offense.  *Id.* ¶ 71.  In addition, four levels are added pursuant to Guidelines section 2A2.1(b)(1)(A), because the victim, K.A., suffered permanent or life-threatening bodily injury.  *Id.* ¶ 68.

For Count One, the base offense level plus the aforementioned enhancements result in an adjusted offense subtotal of 39.  *Id.* at ¶ 72.

### b.  Count Two

Count Two charges Defendant with committing a Terrorist Attack and Other Violence against a Mass Transportation System and Vehicle Carrying Passengers and Employees, specifically with respect to victim H.B.  The applicable guideline for Count Two is Guidelines section 2A2.1, and the base level is 33, per Guidelines section 2A2.1, because the object of the offense would have constituted first degree murder.  *Id.* ¶ 73.  Two levels are added pursuant to Guidelines section 3C1.1 because Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to Defendant's offense of conviction and any relevant conduct; or a closely related offense.  *Id.* ¶ 77.  In addition, two levels are added pursuant to Guidelines section 2A2.1(b)(1)(B), because the victim, H.B., suffered serious bodily injury.  *Id.* ¶ 74.

For Count Two, the base offense level plus the aforementioned enhancements result in an adjusted offense subtotal of 37.  *Id*. at ¶ 78.

### c.  Count Three

Count Three charges Defendant with committing a Terrorist Attack and Other Violence against a Mass Transportation System and Vehicle Carrying Passengers and Employees, specifically with respect to victim V.C.  The applicable guideline for Count Three is Guidelines section 2A2.1, and the base level is 33, per Guidelines section 2A2.1, because the object of the offense would have constituted first degree murder.  *Id.* ¶ 79.  Two levels are added pursuant to Guidelines section 3C1.1 because Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to Defendant's offense of conviction and any relevant conduct; or a closely related offense.  *Id.* ¶ 83.  In addition, two levels are added pursuant to Guidelines section 2A2.1(b)(1)(B), because the victim, V.C., suffered serious bodily injury.  *Id.* ¶ 80.

For Count Three, the base offense level plus the aforementioned enhancements result in an adjusted offense subtotal of 37.  *Id*. at ¶ 84.

### d.  Count Four

Count Four charges Defendant with committing a Terrorist Attack and Other Violence against a Mass Transportation System and Vehicle Carrying Passengers and Employees, specifically with respect to victim A.G.  The applicable guideline for Count Four is Guidelines section 2A2.1, and the base level is 33, per Guidelines section 2A2.1, because the object of the offense would have constituted first degree murder.  *Id.* ¶ 85.  Two levels are added pursuant to Guidelines section 3C1.1 because Defendant willfully obstructed or impeded, or attempted to

obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to Defendant's offense of conviction and any relevant conduct; or a closely related offense.  *Id.* ¶ 89.  In addition, two levels are added pursuant to Guidelines section 2A2.1(b)(1)(B), because the victim, A.G., suffered serious bodily injury.  *Id.* ¶ 86.

For Count Four, the base offense level plus the aforementioned enhancements result in an adjusted offense subtotal of 37.  *Id.* at ¶ 90.

### e. Count Five

Count Five charges Defendant with committing a Terrorist Attack and Other Violence against a Mass Transportation System and Vehicle Carrying Passengers and Employees, specifically with respect to victim F.H.  The applicable guideline for Count Five is Guidelines section 2A2.1, and the base level is 33, per Guidelines section 2A2.1, because the object of the offense would have constituted first degree murder.  *Id.* ¶ 91.  Two levels are added pursuant to Guidelines section 3C1.1 because Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to Defendant's offense of conviction and any relevant conduct; or a closely related offense.  *Id.* ¶ 95.  In addition, four levels are added pursuant to Guidelines section 2A2.1(b)(1)(A), because the victim, F.H., suffered permanent or life-threatening bodily injury.  *Id.* ¶ 92.

For Count Five, the base offense level plus the aforementioned enhancements result in an adjusted offense subtotal of 39.  *Id.* at ¶ 96.

### f.  Count Six

Count Six charges Defendant with committing a Terrorist Attack and Other Violence against a Mass Transportation System and Vehicle Carrying Passengers and Employees, specifically with respect to victim A.L.  The applicable guideline for Count Six is Guidelines section 2A2.1, and the base level is 33, per Guidelines section 2A2.1, because the object of the offense would have constituted first degree murder.  *Id.* ¶ 97.  Two levels are added pursuant to Guidelines section 3C1.1 because Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to Defendant's offense of conviction and any relevant conduct; or a closely related offense.  *Id.* ¶ 101.  In addition, two levels are added pursuant to Guidelines section 2A2.1(b)(1)(B), because the victim, A.L., suffered serious bodily injury.  *Id.* ¶ 98.

For Count Six, the base offense level plus the aforementioned enhancements result in an adjusted offense subtotal of 37.  *Id.* at ¶ 102.

### g.  Count Seven

Count Seven charges Defendant with committing a Terrorist Attack and Other Violence against a Mass Transportation System and Vehicle Carrying Passengers and Employees, specifically with respect to victim R.P.  The applicable guideline for Count Seven is Guidelines section 2A2.1, and the base level is 33, per Guidelines section 2A2.1, because the object of the offense would have constituted first degree murder.  *Id.* ¶ 103.  Two levels are added pursuant to Guidelines section 3C1.1 because Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to

Defendant's offense of conviction and any relevant conduct; or a closely related offense.  *Id.* ¶ 107.  In addition, four levels are added pursuant to Guidelines section 2A2.1(b)(1)(A), because the victim, R.P., suffered permanent or life-threatening bodily injury.  *Id.* ¶ 104.

For Count Seven, the base offense level plus the aforementioned enhancements result in an adjusted offense subtotal of 39.  *Id.* at ¶ 108.

### h.   Count Eight

Count Eight charges Defendant with committing a Terrorist Attack and Other Violence against a Mass Transportation System and Vehicle Carrying Passengers and Employees, specifically with respect to victim I.S.  The applicable guideline for Count Eight is Guidelines section 2A2.1, and the base level is 33, per Guidelines section 2A2.1, because the object of the offense would have constituted first degree murder.  *Id.* ¶ 109.  Two levels are added pursuant to Guidelines section 3C1.1 because Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to Defendant's offense of conviction and any relevant conduct; or a closely related offense.  *Id.* ¶ 113.  In addition, four levels are added pursuant to Guidelines section 2A2.1(b)(1)(A), because the victim, I.S., suffered permanent or life-threatening bodily injury.  *Id.* ¶ 110.

For Count Eight, the base offense level plus the aforementioned enhancements result in an adjusted offense subtotal of 39.  *Id.* at ¶ 114.

### i.   Count Nine

Count Nine charges Defendant with committing a Terrorist Attack and Other Violence against a Mass Transportation System and Vehicle Carrying Passengers and Employees, specifically with respect to victim J.T.  The applicable guideline for Count Nine is Guidelines

section 2A2.1, and the base level is 33, per Guidelines section 2A2.1, because the object of the offense would have constituted first degree murder.  *Id.* ¶ 115.  Two levels are added pursuant to Guidelines section 3C1.1 because Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to Defendant's offense of conviction and any relevant conduct; or a closely related offense.  *Id.* ¶ 119.  In addition, two levels are added pursuant to Guidelines section 2A2.1(b)(1)(B), because the victim, J.T., suffered serious bodily injury.  *Id.* ¶ 116.

For Count Nine, the base offense level plus the aforementioned enhancements result in an adjusted offense subtotal of 37.  *Id*. at ¶ 120.

### j.   Count Ten

Count Ten charges Defendant with committing a Terrorist Attack and Other Violence against a Mass Transportation System and Vehicle Carrying Passengers and Employees, specifically with respect to victim Z.Y.  The applicable guideline for Count Ten is Guidelines section 2A2.1, and the base level is 33, per Guidelines section 2A2.1, because the object of the offense would have constituted first degree murder.  *Id.* ¶ 121.  Two levels are added pursuant to Guidelines section 3C1.1 because Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to Defendant's offense of conviction and any relevant conduct; or a closely related offense.  *Id.* ¶ 125.  In addition, four levels are added pursuant to Guidelines section 2A2.1(b)(1)(A), because the victim, Z.Y., suffered permanent or life-threatening bodily injury.  *Id.* ¶ 122.

For Count Ten, the base offense level plus the aforementioned enhancements result in an adjusted offense subtotal of 39. *Id*. at ¶ 126.

### k.  Count Eleven

Count Eleven charges Defendant with Discharging a Firearm during a Crime of Violence. The applicable guideline for Count Eleven is Guidelines section 2K2. *Id*. at ¶ 127. Chapters Three and Four, which correspond to Adjustments and Criminal History and Criminal Livelihood, respectively, do not apply to this Count. *Id.*

### 2.  Combined Total Adjusted Offense Level

Where there are multiple count adjustments to consider, units are assigned pursuant to Guidelines section 3D1.4(a), (b). and (c). *Id.* at ¶ 128. One unit is assigned to the group with the highest offense level. *Id.* One additional unit is assigned for each group that is equally serious or from 1 to 4 levels less serious. *Id.* One-half unit is assigned to any group that is 5 to 8 levels less serious than the highest offense level. *Id.* Any groups that are 9 or more levels less serious than the group with the highest offense level are disregarded. *Id.*

Counts One though Eleven each stand alone. *Id.* The greater of the adjusted offense levels on Counts One through Eleven is 39. *Id.* at ¶ 129. A further five levels are added pursuant to Guidelines section 3D1.4, bringing Defendant's total adjusted offense level to 44. *Id.* at ¶¶ 130-31. However, pursuant to Chapter 5, Part A (comment n.2), when the total offense level exceeds 43, the offense level will be treated as a level 43. *Id.* at ¶ 134. Therefore, Defendant has a total adjusted offense level of 43. *Id.*

### ii.    The Defense's Objection

The defense agrees Defendant has a criminal history score of zero and a criminal history category of I. Def. Mem., ECF No. 81, at 7. However, the defense disagrees with the

aforementioned calculation of the total adjusted offense level. *Id.* at 1. The defense argues three

key errors in the calculation result in an erroneous inflation of Defendant's adjusted offense

level. *Id.* First, defense counsel argues Probation's reliance on Guidelines section 2A2.1(a) is

improper. *Id.* at 2. Defense counsel contends Guidelines section 2A2.1(a) requires a specific

intent to commit murder, and argues Defendant lacked this requisite intent at the time of the

attack. *Id.* at 3. Instead, defense counsel argues Defendant acted "[w]ith extreme and even

depraved indifference to human life." *Id.* at 4. Defense counsel concedes Defendant began

preparing for "committing a mass shooting years" before the attack. *Id.* However, defense

counsel argues "while [Defendant's] state of mind leading up to the attack is relevant, the

ultimate and dispositive mens rea is the one he possessed when it commenced." *Id.* (citing

*United States v. Velazquez*, 246 F.3d 204, 210 (2d Cir. 2001)). According to defense counsel, in

"the heat of the moment," Defendant's plans changed. *Id.* Defense counsel argues Defendant

had the train occupants at his mercy and the only reason none of them were killed was because

Defendant made it so. *Id.* Defense counsel therefore concludes the proper base level offense for

Counts One through Ten is Guidelines section 2A2.2, which corresponds to Aggravated Assault.

*Id.* Second, defense counsel argues Defendant should not receive a two-point enhancement for

obstruction of justice on each of Counts One through Ten because Defendant's statement during

his plea allocation—that he did not intend to kill his victims—was subjectively true and

objectively consistent with the evidence. *Id.* at 5. Third, defense counsel argues Defendant is

entitled to receive a three-point adjustment for acceptance of responsibility, pursuant to

Guidelines section 3E1.1, because he pled guilty rather than "forcing the case to trial." *Id.* at 6.

Factoring in these adjustments, defense counsel argues Defendant's correct total adjusted

offense level is 28. *Id.* at 7. Therefore, defense counsel calculates the correct Guidelines range

for Defendant on Counts One through Ten is 78 to 97 months of imprisonment. *Id.* Finally, considering the additional 120 months of imprisonment to the Court must impose for Count Eleven, defense counsel calculates Defendant's total guidelines range is 198 to 217 months of imprisonment. *Id.*

### iii.    The Government's Response

In response to the defense's objections, the Government argues the PSR correctly calculates Defendant's adjusted offense level and urges the Court to adopt the PSR in its entirety. Gov. Mem., ECF No. 83, at 1. First, the Government argues Defendant's intent to commit murder is "overwhelmingly established" by numerous pieces of evidence, including (1) the timing and location of Defendant's attack; (2) the "kill funnel" tactic Defendant used to trap his victims and thereby inflict maximum damage; (3) the weaponry Defendant used, including that the "type of gun, magazine, and ammunition" were "specifically designed to maximize the harm caused by each gunshot"; (4) the statements Defendant made in social media posts and uploaded to YouTube, in which he clearly evinced a desire to kill; (5) the trajectory of Defendant's bullets which were aimed toward where train passengers were expected to sit and stand; and (6) the reality that while no one was killed in the attack, "medical evidence shows several victims required life-saving emergency surgery and could have died from their wounds had they not received [] medical care." *Id.* at 12-18. Considering this evidence, the Government argues Defendant clearly intended to commit murder and thus concludes the PSR employs the proper base level offense. *Id.*

Second, the Government argues Defendant obstructed justice during his plea allocution when he stated he did not intend to kill his victims, which, the Government reasons, is contradicted by the evidence before this Court. *Id.* at 18. The Government also argues this false

statement is "material to sentencing because [his] intent to kill as opposed to an intent to cause serious injury is a highly relevant factor under Section 3553(a)." *Id.* at 20. The Government therefore determines Defendant properly received a two-point enhancement for obstruction of justice on each of Counts One through Ten. *Id.*

Finally, the Government disagrees with the defense's assertion that Defendant accepted responsibility for his crimes. Thus the Government argues Defendant should not receive the three-level reduction for acceptance of responsibility under Guidelines section 3E1.1(a) and (b). The Government begins by noting a defendant is not entitled to a reduced sentence under this section simply by virtue of pleading guilty and that instead, "[t]he defendant must truthfully admit the conduct comprising the offense of conviction." *Id.* (citing *United States v. Reyes*, 9 F.3d 275, 279 (2d Cir. 1993)). The Government argues because Defendant's claim that he did not intend to kill his victims and intended only to cause serious bodily injury was false, Defendant has not "fully accepted responsibility for his crime." *Id.* at 22. Furthermore, the Government contends, while Defendant now claims he did not pursue a trial and "pled [guilty] early to spare his victims from testifying and save government responses, this is simply not true." *Id.* (internal citation omitted). In support of this assertion, the Government points to the multiple pretrial motions filed by Defendant, his failure to change his plea to guilty until less than two months before trial, and statements made by Defendant up until his plea indicating his intention to proceed to trial. *Id.*

### iv. Recommendations

#### a. Probation

Based on the findings set forth in the PSR, the United States Probation Department ("Probation") recommends the following: (1) on Counts One through Ten, life imprisonment on

each count to run concurrently to the other counts, and an Order of Restitution in an amount to be determined by the Court, due immediately and payable at a rate of $25.00 per quarter while Defendant is in custody, and (2) on Count Eleven, ten years of incarceration—the statutory requirement—to run consecutive to all other counts. *See* U.S. Probation Department Sentence Recommendation ("Probation's Recommendation") at 1, ECF No. 76-1.

Probation reports it does not find any applicable mitigating factors. *Id.* While Probation recognizes the gravity of its recommendation, it argues this sentence appropriately reflects "[Defendant's] callous disregard for the innocent victims in this case, the damage done to the countless bystanders traumatized by [Defendant's] actions, and [Defendant's] ongoing refusal to truly accept responsibility for his actions." *Id.*

### b.  The Government

The Government urges this Court to impose ten concurrent terms of life imprisonment on Counts One through Ten in addition to a mandatory consecutive sentence of ten years' imprisonment on Count Eleven. *See generally* Gov. Mem.  In making this recommendation, the Government argues the calculated orchestration of Defendant's attack, which unfolded over years, "reflects [Defendant's] lack of regard for human life." *Id.* at 23.  The Government argues Defendant deliberately perpetrated the attack during the morning rush hour to "maximize the terror he could cause and the attention he could receive for his violent actions." *Id.*  The Government also urges the Court to consider the enormous suffering Defendant inflicted upon his victims. *Id.* at 23-24.  As an illustration of their hardship, the Government has submitted written statements by two of Defendant's victims. *See* Gov. Supp. Mem., ECF No. 84.  The Court has carefully reviewed these statements and thanks the victims for their courage in drafting and submitting them.  The Government also reports many other victims remain so traumatized

27

by the events of April 12, 2022 they cannot bear to relive the attack even by writing letters to the Court. *Id.* at 22.

The Government acknowledges the hardship Defendant faced in his youth as well as his ongoing struggle with mental illness. *Id.* at 25. The Government also expresses its support for Defendant receiving "all available mental health treatment in custody." *Id.* However, the Government argues "Defendant's mental health issues do not warrant a lesser sentence." *Id.* In support of this argument, the Government argues Defendant stopped taking medication to treat his symptoms of schizophrenia of his own volition and that Defendant did not claim to "hallucinate[] or hear[] voices on the day of the attack." *Id.* Additionally, the Government argues Defendant's claims he committed the attack to spur reforms within the mental health system are contradicted by Defendant's own statements demonstrating he wanted to commit murder for the purposes of retaliation, revenge, and to pay homage to his heroes, including the infamous Ted Bundy. *Id.* at 24-25. Finally, the Government argues its recommended sentence is necessary for both specific and general deterrence. *Id.* at 25. With respect to this Defendant, the Government argues he remains a threat to the community. *Id.* Additionally, the Government argues a life sentence "will deter others who may contemplate similar attacks from carrying them out." *Id.*

### c. The Defense

The defense, on the other hand, advocates for a sentence of 18 years of imprisonment. Def. Mem. at 1. Defense counsel acknowledges the seriousness of Defendant's crime and the severity of the harm Defendant inflicted upon his victims. *Id.* ("[Defendant's] crime was a horrible act of extraordinary recklessness, evincing an extreme indifference to human life."). However, defense counsel argues the Court must consider Defendant's origins, as a young man

plagued by family tragedy and mental illness, to his present, as an older man still battling mental illness and afflicted with myriad physical health issues.  *See generally id.*

Defense counsel contextualizes Defendant's upbringing as one marked by significant hardship: the death of family members, including Defendant's mother when he was a small child; poverty; and abuse at the hands of Defendant's own father.  *Id.* at 7.  Defense counsel also explains Defendant was "[t]ormented by lifelong paranoid schizophrenia," which first appeared in Defendant's childhood.  *Id.* at 1, 7.  Defense counsel reports Defendant went on to battle severe mental illness and alcoholism for the rest of his life, and that, while he constantly moved from state to state and repeatedly sought treatment to "escape his demons," he was never able to do so.  *Id.* at 8.  Defense counsel also reports since his first meeting with a high school guidance counselor as a teenager, Defendant has been given varied diagnoses, including "alcohol abuse and dependence, chronic, severe; alcohol use, with alcohol-induced disorder; bipolar disorder-depressed mood; cannabis abuse; major depression and auditory hallucinations and paranoid delusions; major depressive disorder; schizophrenia- chronic, paranoid type; social phobia; unspecified alcohol-related disorders; unspecified schizophrenia and other psychotic disorder."  Def. Mem. Letter, ECF No. 81-1 at 6.  Ultimately, defense counsel characterizes Defendant as a very sick man in desperate need of help he would never find.  Def. Mem. at 9.

Defense counsel also urges the Court to consider Defendant's present physical condition, including Defendant's advanced age and numerous health issues.  *Id.* at 11. ("[Defendant's] physical health conditions are numerous: in addition to alcoholism and schizophrenia, he suffers from obesity, hypertension, hyperlipidemia, gastroesophageal reflux, sleep apnea, podiatric diseases, tinnitus, and vision impairments.").  Defense counsel argues the Bureau of Prisons ("BOP") is not equipped to manage Defendant's complex medical and mental health problems.

*Id.* at 11-23.  As an illustration of this reality, defense counsel cites a recent event in which Defendant was hospitalized with "acute pancreatitis as well as gallstones," and, upon discharge to the MDC, was denied hospital-prescribed medication for several days until defense counsel intervened successfully on his behalf.  *Id.* at 12.  Defense counsel warns the medical care available in the BOP is insufficient and that the psychiatric care available "is, if possible, even worse than the medical care."  *Id.*

Defense counsel also stresses the length of Defendant's sentence is material to his conditions of confinement.  *Id.* at 13 (explaining male inmates with sentences of more than 30 years' imprisonment and more than 20 years' imprisonment are typically housed in high and medium security level institutions, respectively).  Pointing to Defendant's track record at the MDC, defense counsel also argues Defendant has proven he does not pose a risk of potential violence.  *Id.* at 14 ("Despite the notoriety of his criminal case, and his severe mental illness, [Defendant] has sustained only one minor, 300-level disciplinary infraction in seventeen months, for Refusing to Obey an Order/Being in an Unauthorized Area—he did not hustle into his cell and lock its door as quickly as the guard would have liked.").  Defense counsel reports Defendant's physicians believe he is not a threat to himself or others, but caution "he needs access to ongoing medication management for his psychotic symptoms" as well as "access to meaningful mental health counseling."  *Id.*

Finally, defense counsel highlights Defendant's contrition for his offense and reports Defendant "feels significant and genuine remorse for the harm he caused."  *Id.*  According to defense counsel, Defendant "hopes to help bring closure and justice to those who suffered, unfairly, from his unthinkable response to his pain."  *Id.*  In closing, defense counsel states Defendant "was cast aside until he found a devastating way to make himself seen."  *Id.* at 15.

### E.  Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement .

. . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5).

The Court has considered Probation's statement that dozens of additional victims

suffered injuries and emotional trauma which are not accounted for in the Guidelines calculation

and "may warrant an upward departure per USSG §5K2.0 and §5K2.21."  PSR ¶ 200.  Its

sentencing decision is informed by the Commission's guidance.

### F.  The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted

sentence disparities among defendants with similar records who have been found guilty of

similar conduct."  18 U.S.C. § 3553(a)(6).

For the reasons stated in this Memorandum and Order, and considering the other six §

3553(a) factors, the Court's sentence avoids unwarranted sentence disparities.

### G.  The Need to Provide Restitution

Finally, the seventh § 3553(a) factor requires the Court to touch upon "the need to

provide restitution to any victims of the offense."  18 U.S.C. § 3553(a)(7).

Restitution in this case is mandatory pursuant to 18 U.S.C. § 3663A.  The Government has

requested restitution in the amount of $6,273.66 payable to two of the victims who have submitted

requests for restitution.  The Court also reserves its right pursuant to 18 U.S.C. § 3664(d)(5) to

hold an evidentiary hearing within 90 days after it imposes sentence to determine the specific

amount Defendant owes to each victim.

## CONCLUSION

In accordance with the analysis above, the Court sentences Defendant to a term of imprisonment of life on Count One; a term of imprisonment of life on Count Two; a term of imprisonment of life on Count Three; a term of imprisonment of life on Count Four; a term of imprisonment of life on Count Five; a term of imprisonment of life on Count Six; a term of imprisonment of life on Count Seven; a term of imprisonment of life on Count Eight; a term of imprisonment of life on Count Nine; a term of imprisonment of life on Count Ten; and a term of imprisonment of life on Count Eleven. The Court also imposes a mandatory special assessment of $1,100.00, reflecting one hundred dollars per each of the eleven counts; given the Defendant's inability to pay a fine, no fine; and restitution in the amount of $6,273.66 to the victims identified by the Government. The Court finds this sentence is appropriate and comports with the dictates of § 3553. The Court declines to impose a term of supervised release at this time but will allow an application for a term of supervised release to be imposed at a future date should such application be appropriate.

The Court expressly adopts the factual findings of the Presentence Investigation Report and its addendum, barring any errors contained therein, to the extent they are not inconsistent with this opinion.

SO ORDERED.

s/ WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: October 5, 2023
       Brooklyn, New York

32